No. 24        July 9, 2015        417

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

JOSEPH LUCIO JIMENEZ,
aka Joseph L. Jimenez,
*Respondent on Review.*

(CC 110241478; CA A148796; SC S062473)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 12, 2015.

Anna M. Joyce, Solicitor General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Ellen F. Rosenblum, Attorney General.

Anne Fujita Munsey, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Elizabeth G. Daily, Federal Public Defender's Office, Portland; Shauna M. Curphey, Curphey & Badger, PA, Portland; and Jordan R. Silk, Schwabe, Williamson & Wyatt, PC, Portland, filed a brief on behalf of *amici curiae* Oregon Justice Resource Center and Oregon Criminal Defense Lawyers Association.

WALTERS, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Kistler, J., concurred and filed an opinion in which Linder and Landau, JJ., joined.

_____

* Appeal from Multnomah County Circuit Court, Christopher J. Marshall, Judge. 263 Or App 150, 326 P3d 1222 (2014).

**WALTERS, J.**

In this criminal case, an Oregon state trooper stopped defendant for jaywalking and asked him if he had any weapons on him. For the reasons that follow, we conclude that Article I, section 9, of the Oregon Constitution[1] does not permit a law enforcement officer to make such an inquiry as a matter of routine and in the absence of circumstances that indicate danger to the officer or members of the public. In contrast, when an officer has probable cause to detain an individual and conduct a traffic investigation, and the officer has reasonable, circumstance-specific concerns for the officer's safety, the officer may inquire about the presence of weapons. In that instance, the officer's inquiry is reasonably related to the traffic investigation and reasonably necessary to effectuate it, and therefore does not violate Article I, section 9. Because that standard was not met in this case, we affirm the decision of the Court of Appeals, *State v. Jimenez*, 263 Or App 150, 326 P3d 1222 (2014), and reverse the judgment of the circuit court.

The following uncontested facts are taken from the trooper's testimony at the hearing on defendant's motion to suppress evidence that the trooper obtained during his encounter with defendant. The trooper drove by a busy Portland intersection and noticed that, after he did so, defendant crossed the street against a "Don't Walk" sign—a Class D violation under ORS 814.020(1) and (3).[2] The trooper

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] ORS 814.020 provides:

"(1) A pedestrian commits the offense of pedestrian failure to obey traffic control devices if the pedestrian does any of the following:

"(a) Fails to obey any traffic control device specifically applicable to the pedestrian.

"(b) Fails to obey any specific traffic control device described in ORS 814.010 [(Appropriate responses to traffic control devices)] in the manner required by that section.

"(2) A pedestrian is not subject to the requirements of this section if the pedestrian complies with directions of a police officer.

turned his car around and drove to a position near defendant, who was sitting on a bench at a bus stop. When defendant saw the trooper's car approach, he got up and began to walk away. The trooper honked his horn and motioned to defendant to come and talk to him, which defendant did.

The trooper knew that the intersection was in a high-crime area where a lot of recent gang activity had occurred. He observed that defendant was wearing an "oversized" or "puffy" jacket over a "hoodie sweatshirt," "oversized baggy gray pants," and "white tennis shoes," and was carrying what could be a green lanyard—garb that the trooper thought might indicate gang affiliation.

The trooper got out of his car, approached defendant, and began a conversation with him. The encounter was recorded by a video camera in the trooper's car, and the video recording, which was played for the trial court at the suppression hearing, confirms the following facts to which the trooper also testified. The trooper told defendant why he had stopped him and asked defendant why he had crossed the street against the light. Defendant replied that he had seen somebody else doing the same thing and "thought it was okay." The trooper responded that he understood what defendant was saying but that the light was red and said "Don't Walk." Defendant indicated that he knew that but that someone else had crossed, so he "thought it was okay as well."

At that point, the trooper asked "do you have any weapons on you?" Defendant "kind of sighed and closed his eyes and said yes." The trooper asked defendant what he had, and defendant answered that he had a gun. Without being asked, defendant then separated his feet, leaned forward, separated his hands, and put his hands on the hood of the trooper's car. The trooper put defendant in handcuffs, called for backup and continued to question defendant; however, the trooper did not ask additional questions about the jaywalking and did not cite defendant for jaywalking. The trooper frisked defendant, located the gun, and learned that

---

"(3) The offense described in this section, pedestrian failure to obey traffic control devices, is a Class D traffic violation."

defendant kept the gun for "protection" and that he was indeed a gang member. When backup did not arrive, the trooper placed defendant in his patrol car and took him to the police station. Defendant ultimately was charged with one count of unlawful possession of a firearm[3] under ORS 166.250(1)(a).[4]

Before trial, defendant filed a motion to suppress "all evidence *** obtained during his illegal seizure and the illegal search of his person, as well as fruits derived from his illegal seizure and/or illegal search of his person." He argued that the trooper had questioned him and discovered the gun during an unjustified extension of the traffic stop. The state maintained that the trooper's questioning and discovery were justified by the officer-safety exception to the warrant requirement articulated in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), and proffered testimony from the trooper that he had asked defendant about weapons "for officer safety reasons." The trooper testified that he had asked defendant if he had any weapons on him, "which I do with all contacts on the street with pedestrians, just for—obviously for officer safety reasons." The trooper explained that "[i]t makes [it] a lot easier if we can stand and have a normal conversation if there's no weapons on the person." The trial court denied defendant's motion to suppress, and defendant was subsequently tried and convicted.

Defendant appealed to the Court of Appeals, which reversed the circuit court judgment. *Jimenez,* 263 Or App at 161. The court reasoned that when a police officer stops an individual to investigate a noncriminal traffic offense, the officer "must proceed to process the traffic violation, and may not launch an investigation into unrelated matters unless the inquiries are justified by reasonable suspicion of the unrelated matter, the inquiry occurred during an unavoidable lull in the citation-writing process, or some

---

[3] Defendant also was charged with, and acquitted of, one count of possession of a loaded firearm in public.

[4] ORS 166.250(1) provides, in part:

"Except as otherwise provided *** a person commits the crime of unlawful possession of a firearm if the person knowingly:

"(a) Carries any firearm concealed upon the person."

exception to the warrant requirement applies." *Id*. at 157. The court noted that the state had not argued on appeal that the trooper "had reasonable suspicion of criminal activity when he asked defendant about weapons, or that there was an unavoidable lull."[5] *Id*. at 158. Rather, the state had argued only that the trial court had been correct to conclude that the trooper's inquiry was lawful under the officer-safety doctrine articulated in *Bates*. *Id*. The court rejected that argument and reversed, concluding that the facts on which the trooper had relied were not comparable to those that justified a patdown search in *State v. Miglavs*, 337 Or 1, 90 P3d 607 (2004), and therefore were "not sufficient to create in [the trooper's] mind a reasonable suspicion that defendant presented a risk to [the trooper's] safety." *Id*. at 160-61.

On review in this court, the state refines the argument that it made in the Court of Appeals and argues that, under *State v. Watson*, 353 Or 768, 305 P3d 94 (2013), a law enforcement officer who stops an individual to investigate a traffic violation is entitled to take actions reasonably related to the traffic investigation and reasonably necessary to effectuate it. The state's argument is that a law enforcement officer's inquiry about whether a detained individual possesses weapons always meets that standard because, the state contends, "[t]he inherent dangers to an officer in a traffic stop are undeniable." The state urges us to adopt a blanket rule permitting such inquiries.

Because *Watson* is key to the state's argument, we begin with a review of its facts and analysis. In *Watson*, the officer stopped a motorist to investigate whether the motorist had violated a noncriminal traffic law by crossing the yellow line that divided the north- and south-bound lanes of traffic. The officer questioned the motorist about his driving and also requested his driver's license and verified his driving privileges. The court concluded that the latter actions were reasonably related to the officer's traffic investigation and reasonably necessary to effectuate it, and therefore were lawful under Article I, section 9. *Id*. at 781-82.

---

[5] The state also had declined to make those arguments in the trial court.

The court also explained, however, that an officer who makes a traffic stop is not necessarily limited to investigating the traffic offense and related matters. If the officer has or develops a reasonable suspicion that the detained individual is engaged in unrelated criminal activity, the officer may investigate that activity. *Id*. at 785. In *Watson*, a second officer smelled the odor of marijuana coming from the defendant's car and informed the first officer of that fact. The first officer then engaged in criminal investigatory activities that were unrelated to the traffic investigation—confirming the odor, further questioning the defendant, and using a drug-detection dog. The court concluded that the first officer's activities were constitutionally valid because he had developed a reasonable suspicion that the defendant was in possession of marijuana and the officer therefore had an independent, lawful justification to investigate that crime. *Id*.

An officer also has an independent, lawful justification to conduct a warrantless search for weapons when "the officer develops a reasonable suspicion, based upon specific and articulable facts, that [an individual] might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates*, 304 Or at 524. The "officer-safety" doctrine is necessary because of the unique circumstances to which it applies:

> "A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Id*. at 524-25.

In this case, the Court of Appeals concluded that the trooper's weapons inquiry was unrelated to his traffic investigation and was not justified on either of those independent grounds. On review in this court, the state does not claim that the trooper's inquiry was independently justified

by reasonable suspicion that defendant was in violation of criminal laws pertaining to the possession of weapons.[6] Nor does the state argue that the trooper's inquiry in this case was justified by the officer-safety exception articulated in *Bates*. Rather, the state takes issue with the Court of Appeals' preliminary conclusion that a weapons inquiry is an investigation of an unrelated matter. [7] The state argues that "questions about the presence of weapons are reasonably related to the *safe* investigation of a traffic violation." (Italics in original). The state contends that an officer's inquiry about whether a detained individual has a weapon is reasonably related to a noncriminal traffic investigation because it ensures that the investigation of the traffic violation will be a safe investigation. As the state puts it, "Inquiries about weapons are not aimed at 'launching' a criminal investigation, as the Court of Appeals concluded, but rather [are] related to the processing of the traffic stop in a way that maintains the integrity of the safety of those involved."

For reasons we will explain, we agree with the state that, in appropriate circumstances, an officer's safety concerns may make the officer's actions, including questioning about weapons, reasonably related and necessary to effectuate a traffic stop. The state's argument, however, is that, regardless of whether an officer reasonably perceives an articulable danger, the officer always may inquire about weapons because "[t]he inherent dangers to an officer in a traffic stop are undeniable." In support of that position, the state cites a United States Supreme Court case, *Arizona v.*

---

[6] Several criminal statutes proscribe the possession of firearms and other weapons. For example, ORS 166.240 prohibits any person, except those provided in subsection (2), from carrying concealed weapons. ORS 166.250 prohibits the unlawful possession of a firearm. ORS 166.270 prohibits possession, ownership, or control of a firearm by any person who has been convicted of a felony.

[7] As noted, the state did not argue in the trial court or the Court of Appeals that the trooper's inquiry occurred during an "unavoidable lull" in the traffic investigation. In this court, the state assumes that the trooper's inquiry did not measurably extend the duration of the traffic stop, but does not contend that that fact alone permitted the trooper's inquiry. We therefore do not consider or decide the factual validity or legal significance of the state's assumption, nor do we consider or decide whether an officer's inquiries made during the pendency of a valid seizure implicate Article I, section 9. *See Watson,* 353 Or at 784 n 18 (reserving same issue).

*Johnson*, 555 US 323, 330, 129 S Ct 781, 172 L Ed 2d 694 (2009), for two propositions: first, that "traffic stops are 'especially fraught with danger to police officers,'" *Johnson*, 555 US at 330 (citing *Michigan v. Long*, 463 US 1032, 1047, 103 S Ct 3469, 77 L Ed 2d 1201 (1983)); and second, that "'[t]he risk of harm to both the police and the occupants [of a stopped vehicle] is minimized *** if the officers routinely exercise unquestioned command of the situation.'" *Id.* (citing *Maryland v. Wilson*, 519 US 408, 414, 117 S Ct 882, 137 L Ed 2d 41 (1997)). In *Long*, the Court cited one study that indicated that approximately 30 percent of police shootings occurred when a police officer approached a suspect seated in an automobile. 463 US at 1048 n 13. In *Wilson*, the Court cited a report by the Federal Bureau of Investigation that showed that in 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. 519 US at 413.

The state does not ask that we take judicial notice of those statistics, nor does it suggest another basis on which we can conclude that Portland police officers face equally dangerous risks when they patrol its streets. Furthermore, the statistics cited by the Court do not indicate the number of stops in which officers were assaulted by pedestrians,[8] nor

---

[8] Recognizing that the stops at issue in *Johnson*, *Long*, and *Wilson* were stops of motorists and not of pedestrians, the state asserts, in a footnote, that "parallel dangers inhere to officers stopping a pedestrian for a traffic violation," citing *Maryland v. Buie*, 494 US 325, 334, 110 S Ct 1093, 108 L Ed 2d 276 (1990), for that proposition. *Buie* does not convince us that the United States Supreme Court would consider the dangers that police officers face in encounters with motorists to be equivalent to those they face in encounters with pedestrians. In *Buie*, police officers relied on safety concerns to conduct an in-home search, and the state argued for a rule permitting such searches without requiring that there be an articulable reasonable suspicion of danger. The state asserted that "[o]fficers facing the life threatening situation of arresting a violent criminal in the home should not be forced to pause and ponder the legal subtleties associated with a quantum of proof analysis." *Id*. at 334 n 2. Relying on its decision in *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), the Court rejected the state's argument. The Court explained:

"[D]espite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, the Court in *Terry* did not adopt a bright-line rule authorizing frisks for weapons in all confrontational encounters. Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted. That approach is applied to the protective sweep of a house."

*Id.*

do they include the total number of stops that the officers conducted or the number of stops that the officers conducted without incident.[9] We are therefore unwilling to base our decision in this case on the "legislative facts" to which the state points us, *see State v. Lawson/James*, 352 Or 724, 740, 291 P3d 673 (2012) (court may take judicial notice of "legislative facts" to assist court in deciding legal issue), or on the conclusions that the Supreme Court reached based on those facts.

When an officer does not reasonably perceive a danger, we will not presume that such danger nevertheless exists or that the officer's inquiry about weapons would address such danger. When an officer does not reasonably suspect that the officer's safety or the safety of the public is threatened, safety concerns do not provide a connection between the officer's traffic and weapons investigations, and therefore, the two investigations are not reasonably related under *Watson*.

Our conclusion that Article I, section 9, does not permit a routine weapons inquiry whenever an officer makes a traffic stop answers the state's argument for a *per se* rule.[10] However, the parties' arguments do raise another question: When an officer stops an individual to conduct a

---

[9] In his dissent in *Wilson*, Justice Stevens observed that "the number of stops in which an officer is actually at risk is dwarfed by the far greater number of routine stops." 519 US at 418 (Stevens, J., dissenting). In this case, *amici curiae* call our attention to a 2001 study analyzing the number of incidents of violence during traffic stops in relation to the millions of routine traffic stops that occur annually. According to the study, on average over a ten-year period, "the risk of homicide to a police officer during a traffic encounter was one in 6.7 million" stops and "the risk of assault to a police officer was one in 10,256 stops." Illya D. Lichtenberg and Alisa Smith, *How Dangerous Are Routine Police-Citizen Traffic Stops? A Research Note*, 29 J Crim Just 419, 420 (2001). *Amici* caution against a *per se* expansion of police powers based on anecdotal evidence of dangers to police officers in the absence of scientific data supporting a need for wider police latitude.

[10] That conclusion also answers the state's alternative argument that, even if an officer's weapons inquiry is not always reasonably related to a traffic investigation, it is always "reasonable" under Article I, section 9, and therefore valid. The state posits that all weapons inquiries are constitutionally "reasonable" because they are brief, minimally invasive, and serve to protect officer safety. Because the state's alternative argument depends on a conclusion that we reject—that a weapons inquiry invariably serves to protect officer safety—we do not find it necessary to consider the legal framework for which the state argues or its application in this case.

traffic investigation and does have cognizable safety concerns, does Article I, section 9, preclude the officer from asking the detained individual about weapons?

The court answered that question affirmatively in *State v. Amaya*, 336 Or 616, 631, 89 P3d 1163 (2004), explaining that an officer who has temporarily restrained an individual's liberty and "seized" the individual under Article I, section 9, may make inquiries based on the officer's "reasonable suspicion that [the detained individual] pose[s] an immediate threat of serious injury" to the officer under *Bates*. The Court of Appeals applied that principle in this case, but concluded that the trooper's safety concerns did not meet the *Bates* standard. *Jimenez*, 263 Or App at 161. In reaching that conclusion, the Court of Appeals compared the facts in this case to the facts that the Supreme Court held sufficient to satisfy the *Bates* standard and justify a police officer's precautionary patdown of the defendant in *Miglavs*. *Id*. at 159 (citing *Miglavs*, 337 Or at 13). The Court of Appeals noted that, in this case, the encounter had occurred at mid-day and at a busy commercial intersection, whereas in *Miglavs,* the encounter had occurred at a late hour and in a darkened area where "[h]igh crime areas take on significance." *Id*. The court also explained that, in *Miglavs*, the defendant's clothing had created reasonable officer safety concerns, not because it announced some *possible* gang affiliation, but because the defendant's shirt bore the name of what the officer knew to be a local gang, and one of the defendant's companions had what the officer recognized as a gang tattoo. *Id*. at 160. Those circumstances were not present in this case.[11] Consequently, the Court of Appeals reasoned that, under *Bates* and *Miglavs*, the circumstances known to the trooper were insufficient to create a reasonable suspicion that defendant presented a risk to the trooper's safety. *Id*. at 161. The state does not quarrel

---

[11] The Court of Appeals also declined to consider the bagginess of defendant's clothing, reasoning that the trooper had developed a concern about the nature of defendant's clothing only after he had learned, as a result of his inquiry, that defendant had a gun. *Jimenez*, 263 Or App at 161. It is true that, when the trooper was asked to explain why he put defendant in handcuffs, the trooper focused on the fact that defendant's clothes were big and baggy and could contain more than one firearm. However, we do not read that exchange to mean that the officer had not observed the baggy nature of defendant's clothing earlier in the encounter.

with that conclusion, and neither do we. Because the trooper did not have sufficient information to identify defendant as a gang member or a person who might be carrying a weapon for other reasons, the circumstances present in this case were not sufficiently particularized to justify a search or patdown search under *Bates* and *Miglavs*.

That does not mean, however, that the trooper's weapons inquiry was not reasonably related to and reasonably necessary to effectuate his traffic investigation, as *Watson* requires in this context. [12] In *Watson*, the officer had probable cause to believe that the defendant motorist had committed a traffic violation and had authority to stop and seize the defendant. 353 Or at 781. Therefore, the officer acted within constitutional bounds when he investigated the traffic offense. The officer also acted within constitutional bounds when he requested the motorist's license and verified his driving privileges, because those actions were reasonably related to his investigation of the traffic violation and reasonably necessary to effectuate it. *Id*. at 785. Under that reasoning, the question presented in this case is not limited to whether the particularity requirements of *Bates* and *Miglavs* were met. The trooper did not search defendant or conduct a precautionary patdown search. Instead, the trooper asked defendant whether he had any weapons on him. As the state presents it, the question before us is whether the trooper's inquiry was reasonably related to his traffic investigation and reasonably necessary to effectuate it.

In considering that question, we are cognizant that, although we cannot precisely determine the number of individuals who have guns and use them to assault officers who stop and detain them, such assaults do in fact occur and the resulting harm has been and can be tragic. Although Article I, section 9, does not permit a blanket assumption that all encounters between police officers and detained individuals pose dangers that permit routine weapons inquiries, it also

---

[12] In *Amaya,* the court clarified that "some encounters between a police officer and a citizen are 'mere conversation,' involving no restraint on [a] citizen's liberty," and that such noncoercive encounters are not "seizures" under Article I, section 9. 336 Or at 626. In this case, we address the constitutionality of a weapons inquiry in the context of an acknowledged seizure of defendant.

does not *per se* preclude all such inquiries. When an officer is legally conducting a traffic investigation, the officer is performing an official duty, and Article I, section 9, does not foreclose reasonable steps necessary to do so in safety. Although the particularity requirements of *Bates* and *Miglavs* must be met before an officer may conduct a search or a patdown search for weapons, those requirements do not apply when an officer has seized an individual and has a constitutional basis to continue to temporarily detain and question him or her. In that circumstance, if the officer's weapons inquiry is reasonably related to and reasonably necessary to effectuate the officer's traffic investigation, then, under *Watson*, it is lawful.

For a weapons inquiry conducted in the course of a traffic investigation to be reasonably related to that investigation and reasonably necessary to effectuate it, an officer must have reasonable, circumstance-specific concerns for the officer's safety or the safety of other persons who are present. To justify an officer's weapons inquiry, the officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces. However, if the officer does not have at least a circumstance-specific safety concern, then the officer's weapons inquiry has no logical relationship to the traffic investigation. And, if the officer's circumstance-specific safety concerns are not reasonable, then an officer who acts on those concerns violates Article I, section 9, which protects the people from an "unreasonable search, or seizure."[13]

The remaining question is whether the trooper's inquiry in this case met that standard. Again, the trooper was alone in a high crime area where recent gang activity had occurred. The trooper observed that defendant was

_____

[13] ORS 810.410(3)(d) provides that a police officer "[m]ay make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons." However, in this case, the issue that the lower courts addressed and that the parties raise on review is a constitutional one. *See Amaya*, 336 Or at 631 (considering whether officer's valid inquiry under ORS 810.410(3)(d) nevertheless violated Article I, section 9). The parties do not address how our resolution of the constitutional issue that this case presents may affect the application of ORS 810.410(3)(d) in this or future cases, and we also decline to conduct such an analysis.

wearing an "oversized" or "puffy" jacket over a "hoodie sweatshirt," "oversized baggy gray pants," and "white tennis shoes." Defendant also was carrying what the trooper thought could be a green lanyard. Although the trooper was not certain that defendant was a gang member, the trooper also knew that gang members often will wear such pants and shoes, that the color green is associated with a specific gang, and that baggy clothing can conceal the presence of weapons. Given those facts, the trooper may have been concerned for his safety or the safety of others and may have determined that a weapons inquiry was a reasonable step to address those concerns. But we cannot presume that the trooper actually had those concerns or made that determination. To demonstrate that an officer's weapons inquiry is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that (1) the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger; and (2) the officer's perception and decision were objectively reasonable. To determine whether that standard is met, a court must consider not only the factual circumstances that existed when the officer acted, but also the officer's articulation of the danger that the officer perceived and the reason for the officer's inquiry.

In this case, the trooper testified that when he got out of his car to talk with defendant, he conversed with him without asking about weapons and continued his conversation long enough to obtain defendant's admission that he knew he had crossed the street against a "Don't Walk" signal. The trooper then asked defendant if he had any weapons. The trooper testified that he did so because he asks the same question "with all contacts on the street with pedestrians, just for—obviously for officer safety reasons," and that "[i]t makes [it] a lot easier if we can stand and have a normal conversation if there's no weapons on the person."

On that record, we conclude that the state did not meet its burden to demonstrate that the officer's weapons inquiry was reasonably related to his traffic investigation and reasonably necessary to effectuate it. First, for reasons we have expressed, Article I, section 9, does not permit

officers to make routine weapons inquiries in all traffic investigations. Second, the trooper explained that he routinely asks questions about weapons to make it easier to have a "normal conversation," yet, in this case, the trooper made the weapons inquiry after he already had engaged in "normal conversation" with defendant. Although the facts known to the trooper at the time that he inquired about weapons might have given rise to reasonable, circumstance-specific safety concerns, the trooper did not so testify.

An officer who stops an individual to conduct a traffic investigation and who has reasonable, circumstance-specific concerns for his or her safety is not required to ask, as the first question in the traffic investigation, whether the detained individual has a weapon. An officer may have reasonable safety concerns from the outset of a traffic investigation but decide, for various reasons, not to act on those concerns immediately. Or an officer may reevaluate the significance of existing facts or learn new ones that may give rise to reasonable safety concerns and reasonably necessitate a weapons inquiry. But we cannot infer those facts in every case or in this case in particular. Here, the trooper did not testify, for instance, that defendant's demeanor or motions during the jaywalking investigation gave rise to safety concerns; or that, as he talked with defendant, the trooper considered the setting and the potential for gang violence and decided that, given the tasks that remained, he had safety concerns that could be addressed by asking about weapons.[14] On this record, the state did not establish that the trooper's weapons inquiry was reasonably related to his traffic investigation and reasonably necessary to effectuate it.[15]

---

[14] The trooper did testify that, after he learned that defendant had a gun and that defendant was indeed a gang member, he became concerned for his safety and the safety of others in the area. More specifically, the trooper testified that after he handcuffed defendant, he noticed that a number of people had come to the bus stop and he was afraid of being attacked or caught in crossfire. However, the record does not indicate that those safety concerns were present when the trooper made his weapons inquiry.

[15] For similar reasons, we also reject the state's argument that, even if the trooper's inquiry was unrelated to his jaywalking investigation, it was nevertheless "reasonable" under Article I, section 9. The state posits that the trooper's inquiry was constitutionally "reasonable" because "[i]t was a single question asked at the outset of the traffic stop, and for the purpose of protecting the

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** concurring.

During a traffic stop, an officer asked defendant if he had a weapon. The majority holds that the officer's question was not reasonably related to the stop and, as a result, violated Article I, section 9, of the Oregon Constitution. I concur in the majority's opinion but write separately for two reasons. First, whether the officer's question was reasonably related to the stop matters in this case because, if it were not, then asking the question extended the stop in violation of the Article I, section 9. *See State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010) (considering a similar issue). Second, the problem in this case is not that the evidence was insufficient to justify the officer's question. Rather, the problem, as I understand the majority opinion, is that the officer testified that he asks the same question for officer-safety reasons in every pedestrian stop without regard to the circumstances of stop, and he did not explain why the circumstances of this stop caused him to be concerned for his or anyone else's safety. With that understanding, I concur in the majority's opinion.

Throughout this litigation, defendant has argued that the officer's question unconstitutionally extended the stop. The state, for its part, does not dispute that, as a temporal matter, the question did extend the stop, and it also does not dispute that extending a stop beyond the time reasonably necessary to complete it violates Article I, section 9. *See Rodgers/Kirkeby*, 347 Or at 627-28 (explaining that the officers' questions in both cases extended the stops because their questions occurred after the traffic stops had been completed, were unrelated to the stop, and were not independently justified).[1] The state argues, however, that

---

trooper's safety." The state's argument depends on a conclusion that the trooper made his inquiry based on constitutionally valid safety concerns. However, the record in this case does not support that conclusion, and we therefore do not find it necessary to consider the alternative legal framework for which the state argues or its application in this case.

[1] The Court of Appeals observed that *Rodgers/Kirkeby* is ambiguous as to when an unrelated question that occurs during a stop will extend the stop in

the officer's question about a weapon was reasonably related to the stop and, as a result, did not extend it. Specifically, relying on *State v. Watson*, 353 Or 768, 305 P3d 94 (2013), the state reasons that questions that are reasonably related to a stop, by definition, do not extend the stop in violation of Article I, section 9. *See id.* at 779-80 (describing reasoning in *State v. Fair*, 353 Or 588, 614, 302 P3d 417 (2013)). Rather, questions that are reasonably related to a stop are part and parcel of the stop.[2] It follows that this case does not require the court to decide, and the majority does not decide, whether unrelated questions that occur during the course of a stop but that do not extend it—unrelated questions that, as the Court of Appeals puts it, occur during an "unavoidable lull"—are permissible under Article I, section 9. Rather, all that the majority decides is whether the officer's question was "reasonably related" to the stop. And, because the question was not reasonably related, it extended the stop in violation of Article I, section 9. *See Rodgers/Kirkeby*, 347 Or at 627-28.

In considering whether the officer's question was reasonably related to the stop, I agree with the majority that questions regarding weapons that occur during a stop are not always reasonably related to the stop. Most stops end without incident, and many stops do not provide a basis for asking about weapons. In saying that, I do not discount the risks that officers face in approaching a stopped car whose occupants are unknown or in stopping pedestrians who may, for all the officer knows, pose a risk of harm. After all, a stop is an exercise of coercive authority, and a person who is stopped may respond aggressively (and unexpectedly) for

---

violation of Article I, section 9. *State v. Jimenez*, 263 Or App 150, 154-55, 326 P3d 1222 (2014). As I read the opinion in *Rodgers/Kirkeby*, it holds unsurprisingly that a stop will continue as long as the officer exercises authority over the suspect to detain him or her. 347 Or at 628. It also holds that, if an officer asks a question during a stop that is unrelated to the stop and thus extends the stop beyond the time reasonably necessary to complete it, extending the stop violates Article I, section 9. *Id.* at 627-28.

[2] Of course, questions unrelated to a stop are permissible if the officer reasonably suspects that the suspect has committed another offense and asks about that offense. *See Watso*n, 353 Or at 785. Additionally, if the encounter does not rise to the level of a stop, no justification is needed for an "unrelated" question. *See State v. Ashbaugh*, 349 Or 297, 308, 244 P3d 360 (2010) (no Article I, section 9, implications for "mere conversation").

that reason alone. The risk increases when the stop occurs at night, in an isolated place, or in a high-crime area. However, to say, as the state does, that every stop poses a sufficient risk of injury to ask about weapons without regard to the circumstances is a proposition that is difficult to sustain.

I also agree with the majority that an officer's safety concerns need not be sufficient to justify a search for weapons under *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), before an officer can ask a question about weapons. A question is not a search. To require the same justification for both, as defendant would, fails to recognize the difference. The issue accordingly reduces to when the circumstances of a particular stop will pose a sufficient risk of harm to the officer or others present for the officer to conclude that asking about weapons is reasonably related to the stop. The answer to that issue will vary with the facts and circumstances of each case. Ordinarily, a traffic stop on a freeway in broad daylight will not provide a reason for an officer to inquire, as part of the stop, about weapons. However, a driver may make a furtive gesture, reach under the seat, or pull over slowly so that the driver or a passenger can secrete something. *See State v. Morgan*, 348 Or 283, 290, 230 P3d 928 (2010) (explaining that the officer reasonably seized and searched the passenger's purse when she unexpectedly got out of the car, began acting nervous, and reached into her purse). Those circumstances can justify, at a minimum, a question regarding weapons when the officer explains what it was about the driver's or passenger's behavior that was concerning. *See id.*

In this case, the officer did not stop defendant while he was driving on the freeway. Rather, defendant was a pedestrian, and the stop occurred in a part of Portland—SE 122nd and Division—that the officer testified is "a high crime area [where] there has been—recently over the past, there's been a lot of gang activity," an assessment that defendant himself confirmed.[3] Additionally, defendant's clothing

---

[3] When asked why he was carrying a gun, defendant replied that it "was for protection." When asked why he needed protection, defendant said "something to the effect of the streets are very dangerous or the streets are crazy." Those statements are relevant, not because the officer relied on them in assessing the danger that the area posed, but because defendant's own statements confirmed the officer's independent assessment of the danger.

was "indicative" of gang affiliation, although the officer could not say "for sure" that that was case.[4] Finally, the baggy clothes that defendant was wearing were the sort of clothes in which weapons could be "easily concealed," and defendant had taken steps to avoid the officer when he pulled his patrol car into a gas station next to the bus stop where defendant was sitting.[5]

In my view, those circumstances were sufficient to warrant asking defendant if he had a weapon and did not depend on impermissible stereotyping.[6] The majority does not hold otherwise. Rather, as I read its opinion, its holding rests on the absence of any explanation from the officer why the circumstances of this particular stop raised a safety concern and why the officer asked about weapons when he did. On that issue, the officer testified only that he asked defendant "if he had any weapons on him, which I do for all contacts on the street with pedestrians, just for—obviously officer safety reasons."

The officer's testimony is lacking for two reasons. First, not only did the officer not explain why the circumstances of this stop concerned him, but he explained that he always asks about weapons in every pedestrian stop without regard to the circumstances of the stop. Second, the officer testified that he asked the question "obviously for officer safety reasons." "Officer safety" explains the nature of the officer's concern. It does not identify the facts that, in his mind, gave rise to that concern.

---

[4] The officer explained that he knew that "gang members often will wear a gray baggy pant and the white shoes," as defendant was, and he saw "what [he] thought was a green lanyard, [and he] knew that also to be indicative of some faction of the Bloods gang."

[5] The officer testified that he saw defendant cross an intersection "on the Don't Walk sign," turned his car around, and approached a bus stop where defendant was sitting after having crossed the street illegally. The officer testified that, "[w]hen I pulled in [to the gas station next to the bus stop], he looked over at me, and immediately got up and began to walk away."

[6] Some commentators have noted that the line between profiling and reasonable officer safety concerns can be a fine one. *See* Caleb Mason, *Jay-Z's 99 Problems, Verse 2: A Close Reading with Fourth Amendment Guidance for Cops and Perps*, 56 St Louis U LJ 567, 577 (2012) (discussing officer's question about weapons). In my view, the facts that the officer described in this case reasonably gave rise to legitimate concerns for officer safety. It may be that lesser facts also would be sufficient to justify a question concerning weapons, but this case provides no occasion to decide that issue.

As I read the majority's opinion, it holds that, for a question regarding weapons to be reasonably related to a stop, an officer must explain why the facts or circumstances surrounding a stop caused the officer to have reasonable concerns for the officer's or other persons' safety.[7] I do not disagree with that requirement, and I cannot say that, in light of the way that the parties argued this case before the trial court, the trial court's implicit factual findings provide that link. On that basis, I concur in the majority's opinion.

Linder and Landau, JJ., join in this concurring opinion.

---

[7] In Watson, the court explained that, as a statutory matter, a question must be reasonably related to the stop and reasonably necessary to carry it out. 353 Or at 777. If a question about weapons is reasonably related to a stop—if the facts give rise to a sufficient safety concern to ask about weapons—then it almost automatically follows that the question also will be reasonably necessary to carrying out the stop.