Argued and submitted November 21, 2022, affirmed October 18, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSEPH RICHARD HERMAN CIVIL,
aka Joseph Richard Civil,
*Defendant-Appellant.*

Clackamas County Circuit Court
20CR37322, 20CR54615;
A175546 (Control), A175547

539 P3d 317

Defendant challenges his conviction for felon in possession of a firearm, ORS 166.270, contending that the trial court erred in denying his motion to suppress evidence that was discovered following his arrest, during a traffic stop, on an outstanding warrant. During the traffic stop, the officer conducted a "records check," which included a "warrants check." Defendant contends on appeal that running the records check violated Article I, section 9, of the Oregon Constitution, as interpreted in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019). He argues that it impermissibly expanded the subject-matter scope of the traffic stop, as it was designed to discover information that was necessarily unrelated to the traffic violation, and that it was not otherwise supported on this record for officer-safety reasons. The state disagrees, largely relying on *State v. Leino*, 248 Or App 121, 273 P3d 228, *rev den*, 352 Or 76 (2012)—which was decided before both *State v. Watson*, 353 Or 768, 305 P3d 94 (2013), and *Arreola-Botello* (2019)—as controlling good law on the permissibility of a "records check" during a traffic stop. *Held*: The Court of Appeals concluded that it needed to address only the "warrants check" portion of the records check, because the warrants check was the only part of the records check that led to the discovery of any evidence that defendant sought to suppress. As to the warrants check*, Leino* is not controlling in this case, regardless of whether it remains good law. An individualized inquiry is therefore necessary under *Watson* and *Arreola-Botello*. Ultimately, the Court of Appeals concluded that the state met its burden to establish that the officer's perception of danger and decision to check for warrants to address that danger were objectively reasonable, such that the warrants check was reasonably related to the traffic stop.

Affirmed.

Ulanda L. Watkins, Judge.

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Lagesen, Chief Judge, and Jacquot, Judge.*

AOYAGI, P. J.

Affirmed.

---

\* Jacquot, J., *vice* James, J. pro tempore.

**AOYAGI, P. J.**

This case addresses when law enforcement may run a "warrants check" during a traffic stop. A police officer stopped defendant for a bicycle traffic violation. During the stop, the officer used defendant's identification card to run a "records check," including a warrants check, which alerted the officer to the fact that defendant had an outstanding warrant for his arrest. The officer arrested defendant on the warrant and, during a search incident to arrest, found a handgun. That led to defendant being charged with felon in possession of a firearm, ORS 166.270. Defendant moved to suppress the evidence, arguing that running the records check was not reasonably related to the traffic stop and thus violated Article I, section 9, of the Oregon Constitution, as interpreted in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019). The trial court denied the motion. Defendant then pleaded guilty, reserving the right to appeal the suppression ruling. On appeal, in his sole assignment of error, defendant challenges the suppression ruling. We conclude that the warrants check was reasonably related to the traffic stop and, accordingly, affirm.[1]

## I.   FACTS

Around 3:00 a.m., Officer Inman observed defendant riding his bicycle without any lights in a dimly lit residential area. Inman initiated a traffic stop, because he believed that defendant was violating ORS 815.280, which requires riding with proper lighting equipment. Inman asked for identification, and defendant produced an Oregon Driver and Motor Vehicle Services (DMV) identification card. Using the name and number on the identification card, Inman contacted dispatch to run a "records check." A few minutes later, dispatch confirmed the validity of the identification card and also informed Inman that there was an active warrant for defendant's arrest. Inman arrested defendant on the warrant, searched him incident to arrest, and discovered a handgun.

---

[1] Defendant appealed the judgments in two cases—20CR37322 and 20CR54615—resulting in this consolidated appeal. However, his sole assignment of error pertains to the judgment in case 20CR37322. The judgment in case 20CR54615 is affirmed.

Defendant was subsequently charged with felon in possession of a firearm. He moved to suppress the evidence, arguing that Inman's act of running the records check was not reasonably related to the traffic stop and, thus, was an impermissible subject-matter expansion of the stop under *Arreola-Botello*. If Inman had not run the records check, he would not have learned of the outstanding warrant, would not have arrested defendant, and would not have found the handgun. The state opposed suppression, relying primarily on *State v. Leino*, 248 Or App 121, 273 P3d 228, *rev den*, 352 Or 76 (2012), to argue that the records check was reasonably related to the traffic stop.

The trial court held a hearing on the suppression motion. The dispatch communications manager for the 9-1-1 center, Scobert, testified regarding the "records check" that Inman sought. She explained that, when an officer asks dispatch to run a records check for a traffic stop, the officer provides the number from the driver's license or identification card that was given to the officer, and the dispatcher types that number and a command into the computer-aided dispatch system (CAD). The system automatically generates three different sets of records for that number: Oregon DMV records; Oregon Law Enforcement Data Systems (LEDS) records; and federal NCIC records.[2] The records appear on the screen sequentially, which takes about one to 10 seconds, depending how quickly the system is running. Scobert explained that the automatic generation of the three reports with a single command is due to the CAD vendor having "made the short commands for us to run integrated into the system." It is possible to request DMV, LEDS, and NCIC records individually in the CAD system, but it takes longer than requesting them together. Scobert testified that the combined-reports procedure is easier, faster, and helps ensure "data integrity" and "transparency."

As for the content of the individual reports, Scobert testified that the DMV records help the officer verify the person's identity and the validity of the driver's license or identification card given to the officer. If the traffic stop involves

---

[2] The National Crime Information Center (NCIC) is a national database managed by the Federal Bureau of Investigation.

a motor vehicle, the dispatcher also inputs the license plate number, and the DMV records will include the registered owner's name and if the vehicle has been reported stolen. As for the LEDS and NCIC records, they include information regarding outstanding warrants, protective orders, stalking orders, restraining orders, missing minors and vulnerable adults, "corrections clients," and wanted-persons information. Those records are provided for officer safety and community caretaking.

Inman also testified at the suppression hearing. He testified that it is his standard procedure to request a "records check" during all traffic stops. He runs a "records check" to verify the person's identity and ensure proper issuance of a citation, as well as to obtain other information about the person. That other information includes if the person is on a "watch list," has an outstanding warrant in Oregon or another state, is on supervision (probation or post-prison supervision), or is an "armed career criminal,"[3] in addition to information about restraining orders, protective orders, and missing children associated with the person. A "records check" does *not* include the person's criminal history, which would have to be requested separately.

Inman confirmed that he wanted all of the "records check" information when he requested the records check on defendant. He also confirmed that he received all of the information at the same time.

Inman gave limited testimony regarding the specific value of the LEDS and NCIC records included in the records check. He testified that having such information "absolutely" aids his contact with the stopped individual. Inman extrapolated, "Well, in this instance, as in a number of them, traveling by myself at night in a dimly lit area with an individual I'm unfamiliar with, the more information that I can *** gain about previous violent-type behaviors *** or things that are of concern to my safety, being within contact distance with that individual, I'd say is very

_____

[3] The Armed Career Criminal Act is a federal statute. *See* 18 USC § 924(e) (creating minimum penalties for armed career criminals, *i.e.*, persons who violate 18 USC § 922(g) and have "three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another").

important." With respect to warrant information in particular, Inman testified that he believed it is important to know if the person has an outstanding arrest warrant for a violent crime. He was not asked for his own articulation as to why that information is important to know, but he agreed when asked that it would help explain a person's behavior and mannerisms while interacting with him and that it would assist him in protecting himself, particularly when he is alone with a person whom he knows nothing about.

In making their arguments to the trial court at the suppression hearing, the parties made clear that they agreed on the facts and that the legal issue reduced to whether running the records check was reasonably related to the traffic stop or, conversely, was an unconstitutional subject-matter expansion under *Arreola-Botello*.

Defendant argued for the latter, essentially conceding that asking for a check of DMV records was reasonably related to the traffic stop, but asserting that asking for a check of the other records was not reasonably related. He emphasized that, under *Arreola-Botello*, each officer action and inquiry must be analyzed against the facts of the particular case, to determine whether it is reasonably related to the lawful purpose of the stop, and that it did not matter that it was Inman's standard practice to request a "records check" in all traffic stops. In response, the state emphasized that requesting DMV records was reasonably related to the traffic stop, due to their value for identification and issuance of the citation. As for the LEDS and NCIC records, the state argued that their inclusion in the results did "not negate the fact that the officer had lawful authority to obtain a records check to verify the identity of the defendant" and that combining the reports served efficiency, record keeping, officer safety, and community caretaking. And, as previously mentioned, the state relied on *Leino* as establishing that a "records check" is generally reasonably related to a traffic stop.

The court denied defendant's motion to suppress. Defendant entered a conditional guilty plea, reserving the right to appeal the suppression ruling.

## II.   LEGAL FRAMEWORK

Article I, section 9, prohibits unreasonable seizures by the government. Or Const, Art I, § 9 ("No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."). A traffic stop is a type of seizure. *Arreola-Botello*, 365 Or at 701. "Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction." *State v. Rodgers/Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010).

Officer activities during a traffic stop must be "reasonably related to [the traffic offense] investigation and reasonably necessary to effectuate it." *State v. Watson*, 353 Or 768, 781, 305 P3d 94 (2013); *see also id.* at 778-81 (explaining that the traffic-stop statute, ORS 810.410(3), and the criminal-stop statute, ORS 131.615(3), like Article I, section 9, require officer activities to be reasonably related to the stop and necessary to effectuate it). If the police engage in conduct or make inquiries that are not reasonably related to the traffic offense investigation—either in the midst of the investigation or after the issuance of a citation (if any) is completed or reasonably should be completed—it "must be justified on some basis other than the traffic violation." *Rodgers/Kirkeby*, 347 Or at 623 (emphasis omitted); *see also State v. Thompson*, 370 Or 273, 286-87, 518 P3d 923 (2022) (distinguishing Fourth Amendment case law and stating that, under Article I, section 9, police activities that exceed what is reasonably necessary to effectuate the investigation require an independent constitutional justification).

In *Arreola-Botello*, the Supreme Court announced for the first time that Article I, section 9, imposes both temporal and subject-matter limitations on traffic stops, rejecting the "unavoidable lull" doctrine that our court had previously recognized. 365 Or at 712. Under the "unavoidable lull" doctrine, officers were permitted to engage in activities unrelated to a traffic stop without violating Article I, section 9, "so long as the officer d[id] not delay the processing of a citation or extend the duration of the traffic stop." *Id.* at 705. The Supreme Court rejected that view of Article I, section 9:

"Put simply, an 'unavoidable lull' does not create an opportunity for an officer to ask unrelated questions, unless the officer can justify the inquiry on other grounds." *Id.* at 712. Rather, during a traffic stop, all law enforcement "activities" and "inquiries" must be reasonably related to the traffic-offense investigation and reasonably necessary to effectuate it, which results in both subject-matter and durational limitations. *Id.* Interpreting Article I, section 9, to impose both subject-matter and durational limitations on traffic stops "ensures that officers do not turn minor traffic violations into criminal investigations without a constitutional basis for doing so." *Id.* at 713.

### III.   SCOPE OF OUR ANALYSIS

With that legal framework in mind, we turn to the specifics of this case. We first address a threshold issue regarding the scope of our analysis.

As previously mentioned, defendant essentially conceded in the trial court that Inman asking dispatch to check his DMV records was reasonably related to the traffic stop. *See Watson*, 353 Or at 782 ("[A]n officer's determination of a person's identity generally is reasonably related to the officer's investigation of a traffic infraction."). To the extent that defendant now contends on appeal that Inman should have accepted his DMV identification card at face value and not run a DMV check, he did not make that argument to the trial court, and we therefore decline to address it.

As for Inman simultaneously requesting a check of defendant's LEDS and NCIC records, both in the trial court and on appeal, defendant has focused on the warrant information. Indeed, he refers to what Inman requested as a "warrant check." That is unsurprising, because defendant's warrant status was the only information that Inman obtained from the records check that played any role in Inman arresting defendant and finding the handgun. The state does not dispute that Inman's request for warrant information led to the discovery of the evidence that defendant seeks to suppress; conversely, defendant does not dispute that Inman's request for other information in the LEDS and NCIC records did not lead to the discovery of any evidence.

Nonetheless, defendant sometimes alludes to other information included in LEDS and NCIC records—beyond the warrant information—in making his arguments, so we pause to clarify the scope of our analysis. Because it is undisputed that Inman's request for warrant information was the only part of the "records check" that led to the discovery of evidence that defendant seeks to suppress, we need not—and do not—address whether it was reasonably related to the traffic stop for Inman to request *other* information contained in the LEDS and NCIC records. Those additional record checks did not affect the duration of the stop and, to the extent they expanded the subject matter, they did not result in the discovery of any evidence.

We find support for that approach in *Watson*. There, an officer stopped the defendant for failure to maintain a lane. *Watson*, 353 Or at 769-70. The officer called dispatch and "requested records and warrants checks pursuant to his routine practice" and, during the resulting "unavoidable lull," engaged in unrelated investigative activities that led to the discovery of incriminating evidence. *Id.* at 770-71, 784-85. The defendant moved to suppress that evidence, arguing that the officer "exceeded the limits of Article I, section 9, by detaining defendant for 10 minutes to conduct records and warrants checks and an unrelated criminal investigation." *Id.* at 781-82. The Supreme Court concluded that the "records check" was reasonably related to the traffic stop, because it was done to verify the defendant's driving privileges and did not extend the stop's duration. *Id.* at 782-83. The Supreme Court addressed the "warrants check" separately but concluded that it did not need to decide whether the warrants check was reasonably related to the traffic stop, because it "came back clean" and "did not lead to the discovery of the evidence that defendant sought to suppress." *Id.* at 783-84. "[E]ven if the warrants check was not reasonably related to the investigation, it was not a basis for suppression of the incriminating evidence that the police discovered." *Id.* at 784.

The Supreme Court discussed *Watson* at some length in *Arreola-Botello*. As relevant here, it spoke approvingly of *Watson*'s approach of evaluating each officer action individually, *i.e.*, evaluating the "records check" and "warrants check"

separately, even though they were run simultaneously. 365 Or at 703. It also spoke approvingly of *Watson*'s conclusion that there was "no need to resolve the question whether the warrants check had been reasonably related to the stop because that check had not produced suppressible evidence and had not extended the stop." *Id.* at 707 (emphasis omitted).

We therefore conclude that the only issue that requires determination in this case is whether Inman's request for warrant information on defendant was reasonably related to the traffic stop, such that the trial court did not err in denying defendant's motion to suppress evidence obtained as a result of that request. We turn to the merits.

## IV. ANALYSIS

Defendant contends that Inman's request for warrant information was not reasonably related to the traffic stop. He acknowledges that a police officer who learns of the existence of a duly issued arrest warrant is statutorily authorized to "arrest a person without a warrant," ORS 133.310(2), including during a traffic stop, ORS 810.410(3)(g) (a police officer "[m]ay make an arrest of a person as authorized by ORS 133.310(2), if the person is stopped and detained pursuant to the authority of this section"). He also does not dispute that the warrants check here was done very quickly and did not extend the duration of the stop. He argues, however, that a warrants check impermissibly expands the subject-matter scope of a traffic stop, as it is designed to discover information that is necessarily unrelated to a traffic violation. The state disagrees. We begin by addressing *Leino*, which the state views as controlling.

### A. Leino *Is Not Controlling*

The state relies on *Leino* as established precedent that it does not violate Article I, section 9, for an officer to run a records check during a traffic stop, including a warrants check. The state acknowledges that we decided *Leino* (2012) before the Supreme Court decided *Watson* (2013) and *Arreola-Botello* (2019), and that *Leino*'s reliance on the "unavoidable lull" doctrine is no longer good law. But the state maintains that *Leino* remains controlling good law on the "records check" issue.

We disagree. Regardless of whether portions of *Leino* remain good law, *Leino* is factually distinguishable from the present case in ways that are highly significant after *Watson* and *Arreola-Botello*.

In *Leino*, during a bicycle traffic stop, the officer "ran defendant's name through the system for a 'records check,'" as it was "'standard procedure' to check a person for warrants in the course of a traffic stop." 248 Or App at 123-24. The officer used the "unavoidable lull" created by the records check to conduct an unrelated investigation that led to the discovery of incriminating evidence. *Id.* at 123-25. The defendant moved to suppress that evidence, arguing that running the records check was not reasonably related to the traffic stop and therefore did not give rise to a legitimate unavoidable lull. *Id.* We concluded that "an officer's act of contacting dispatch with a person's identifying information is reasonably related to the identification of the person and the issuance of the citation." *Id.* at 128. We declined to address the "warrant check" separately from the "records check," because "[n]either the parties nor the trial court drew any legal distinction between a records check and a warrant check," because no existing case law drew that distinction, and because the evidentiary record did "not establish a factual basis for any such distinction." *Id.* We emphasized the lack of evidence that the warrant check itself extended the stop's duration. *Id.*

In this case, by contrast, defendant *has* drawn a legal distinction between a DMV records check and a warrants check, that distinction is supported by *Watson* and *Arreola-Botello* as discussed in the last section, and the record provides a factual basis for the distinction. *Leino* is not controlling in this case. The practical consequence of that conclusion is that we are writing on a blank slate, as no other existing case law addresses whether a warrants check was reasonably related to a traffic stop.

B.   *Existing Case Law Requires An Individualized Inquiry*

The state next cites a host of practical reasons that officers should be allowed to run warrants checks as a routine matter during traffic stops. The state contends that a warrants check is not a procedure to detect crime in general, as

defendant contends, but instead "a negligibly burdensome, nonintrusive procedure to determine whether a judge has commanded the arrest of the person temporarily seized for a traffic violation." The state argues that it is reasonable for an officer to "assume that a person detained for a traffic violation, who is a fugitive from justice, presents a greater risk to officer safety than a person without that status." The state argues that permitting officers to run a warrants check simultaneously with a DMV records check promotes efficient law enforcement and public safety. Finally, the state argues that a warrants check "is at bottom directly relevant to determining whether the person temporarily detained for a traffic violation has the right to be released and returned to free-person status at all," which the state analogizes to checking a detained motorist's driving privileges before allowing the motorist to drive away. *See Watson*, 353 Or at 782 (concluding that, in a traffic stop, it is reasonable for an officer to determine whether the driver has valid driving privileges before allowing them to continue on their way). The state appears to be arguing for a *per se* rule under the "reasonably related" standard.

The practical arguments for routine warrants checks during traffic stops are compelling. They would seem to promote both officer safety and public safety in quite obvious ways. If officers are not allowed to check for warrants as a routine matter, they will frequently be in the position of releasing someone from a traffic stop who should have been arrested on an outstanding warrant. Or, officers will have to adopt a habit of checking warrants *after* releasing people, then chasing a person down to arrest them—creating a much more dangerous situation for the officer and the public than if the officer had conducted the arrest while the person was stopped.

Outstanding warrants are a matter of public record, and checking for them is fast and easy with modern technology. Checking for outstanding warrants is very different from an officer asking a stopped individual to disclose the presence of weapons, drugs, or contraband that the officer otherwise would not be able to discover. It likewise is very different from an officer asking a stopped individual for consent to search their vehicle or person, in the hopes of finding evidence that the officer otherwise could not find. The fact

that warrants are a matter of public record not only makes the nature of the police action (running a warrants check) different, but it creates a situation in which a stopped individual may reasonably *assume* that the officer is aware of an outstanding warrant and intends to arrest them, which is a more dangerous situation for the officer if the officer is actually unaware of the outstanding warrant.

No matter how compelling the practical arguments for routine warrants checks during traffic stops may be, however, we understand the Supreme Court to have largely rejected *per se* rules for traffic stops. *See Arreola-Botello*, 365 Or at 712 ("We realize that our decision precludes officers from asking certain investigative questions during investigatory stops—those unrelated to the purpose of the investigation and without independent constitutional justification. But that is as the constitution requires and, for statutory purposes, what the legislature intends."); *State v. Jimenez*, 357 Or 417, 426 & n 10, 353 P3d 1227 (2015) (rejecting the state's proposed *per se* rule that, because of the inherent dangers of traffic stops, a weapons inquiry is either necessarily reasonably related to a traffic stop or inherently "reasonable" under Article I, section 9; "[w]hen an officer does not reasonably suspect that the officer's safety or the safety of the public is threatened, safety concerns do not provide a connection between the officer's traffic and weapons investigations").

To the extent that there is a legally sound path to concluding that a warrants check is always reasonably related to a traffic stop, without the need for an individualized inquiry, the state has not identified it in this case. Accordingly, we proceed to an individualized inquiry as to whether the warrants check in this case was reasonably related to the traffic stop of defendant.[4]

## C.  *Individualized Inquiry*

The question before us, then, is whether the state demonstrated a "'reasonable, circumstance-specific'" relationship between the challenged conduct—Inman's request

---

[4] It is not entirely clear whether the trial court viewed a warrants check as *per se* reasonably related to a traffic stop, or whether the trial court ruled based on the circumstance-specific facts of this case. However, the relevant facts are undisputed, and the issue presented is purely legal (as it was in the trial court).

for warrant information on defendant—and the lawful purposes of the traffic stop. *State v. Pichardo*, 360 Or 754, 759, 388 P3d 320 (2017) (quoting *Jimenez*, 357 Or at 429). In *Jimenez*, the Supreme Court addressed how to determine whether a weapons inquiry based on officer-safety concerns is reasonably related to a traffic stop. 357 Or at 419. Although *Jimenez* involved a weapons inquiry, we understand it to apply to any officer action taken for officer-safety reasons. *See id.* at 424 (concluding that, "in appropriate circumstances, an officer's safety concerns may make the officer's actions, including questioning about weapons, reasonably related and necessary to effectuate a traffic stop").

Under *Jimenez*, "[t]o demonstrate that an officer's [action] is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that (1) the officer perceived a circumstance-specific danger and decided that [the action] was necessary to address that danger; and (2) the officer's perception and decision were objectively reasonable." *Id.* at 430. In assessing whether the state has met its burden, "a court must consider not only the factual circumstances that existed when the officer acted, but also the officer's articulation of the danger that the officer perceived and the reason for the officer's [action]." *Id.* The officer's reasonable, circumstance-specific concerns "need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces." *Id.* at 429. "[T]he reasonable relationship test of *Jimenez* is not a demanding one." *State v. Miller*, 363 Or 374, 388, 422 P3d 240 (2018) (internal quotation makes omitted).

Applying the *Jimenez* standard, defendant does not challenge Inman's subjective belief, so we address only whether it was objectively reasonable for Inman to request a warrants check as a safety measure. Objective reasonableness is a question of law. *Miller*, 363 Or at 386. Although the state put on fairly thin evidence regarding the warrants check specifically, we ultimately conclude that the record was sufficient to establish that Inman's perception and decision to run a warrants check was objectively reasonable.

Inman testified that having information from the LEDS and NCIC records—which includes warrant

information—"absolutely" aids his contact with a stopped individual. In explaining how, he described circumstances of the stop of defendant:

"Well, in this instance, as in a number of them, traveling by myself at night in a dimly lit area with an individual I'm unfamiliar with, the more information that I can *** gain about previous violent-type behaviors *** or things that are of concern to my safety, being within contact distance with that individual, I'd say is very important."

That testimony establishes the objective reasonableness of Inman's perception of danger. Inman's perception of danger was based on circumstance-specific concerns, particularly that he was alone, at night, in a dimly lit area, in close contact with someone he knew nothing about. It is objectively reasonable for an officer under those circumstances to have heightened concerns about safety. Although the circumstances that Inman described are broadly applicable to most late-night traffic stops, as the Supreme Court has explained, "the state can meet its burden to prove that an officer possessed a circumstance-specific perception of danger, within the meaning of *Jimenez*, even if the circumstances that the officer identifies could be expected to exist for most individuals detained under similar circumstances." *Miller*, 363 Or at 383; *see also id*. at 387-88 (concluding that officer's perception of danger during a DUII traffic stop was objectively reasonable, where the officer testified that there is "absolutely nothing safe about administering field sobriety tests on the side of the road at 12:30 in the morning" and that "performing the field sobriety tests would put him in a compromising situation" (internal quotation marks omitted)).

Because Inman's perception of danger was objectively reasonable based on the circumstances alone, it was not necessary, as defendant contends, for defendant to have engaged in specific conduct that concerned Inman. *See id*. at 388 (concluding that the officer's objectively reasonable perception of danger and decision to ask about firearms "were not made unreasonable by evidence that defendant displayed a peaceful demeanor, that other cars were driving by, and that light sources illuminated the scene").

Inman's testimony also establishes the objective reasonableness of his decision to request a warrants check to address his perception of circumstance-specific danger, even if the state could have made a better record on that issue. Inman explained that knowing about an outstanding warrant can help explain a stopped individual's behavior and mannerisms while interacting with him and assists him in protecting himself in an interaction with someone whom he knows nothing about, particularly when he is alone and particularly if the warrant is for a violent crime. Further, it is common sense that a person with an outstanding warrant has a motive to avoid police interaction and, if intending to avoid arrest, may present an additional danger to an officer in a traffic stop. It was objectively reasonable for Inman to want to know whether defendant had any outstanding warrants at the beginning of their interaction.

In sum, under the *Watson* and *Jimenez* reasonable-relationship standard, which is "not a demanding one," *Pichardo*, 360 Or at 762, the evidence establishes a reasonable, circumstance-specific relationship between the warrants check that Inman requested and the lawful purpose of the traffic stop of defendant. The trial court did not err in denying defendant's motion to suppress.

Affirmed.