Argued and submitted November 27, 2013, reversed and remanded
March 30, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM P. MILLER,
*Defendant-Appellant.*

Multnomah County Circuit Court
110646662; A149963

370 P3d 882

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Hadlock, Chief Judge, and Wollheim, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

Defendant appeals the trial court's judgment convicting him of one count of carrying a concealed weapon, ORS 166.240(1), assigning error to the trial court's denial of his motion to suppress evidence obtained when an officer who had stopped him for driving under the influence of intoxicants (DUII) asked him if he had a firearm. Defendant argues that, under Article I, section 9, of the Oregon Constitution,[1] the officer's inquiry constituted an unlawful extension of the DUII stop. For the reasons explained below, we agree and, therefore, we reverse and remand.

Whether an officer's actions constitute an unlawful extension of a stop is a question of law, which we review for errors of law. *State v. Rodgers/Kirkeby*, 347 Or 610, 625, 227 P3d 695 (2010) (citing *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993)); *State v. Pearson*, 262 Or App 368, 369, 323 P3d 994 (2014). When doing so, we "defer to the trial court's findings of historical fact when there is constitutionally sufficient evidence in the record to support those findings." *Pearson*, 262 Or App at 369 (citing *Ehly*, 317 Or at 75); *State v. Gomes*, 236 Or App 364, 370, 236 P3d 841 (2010). Stated in accordance with that standard, the relevant facts are as follows.

At 12:30 a.m., a law enforcement officer was following a truck driven by defendant. The officer saw defendant pause for more than two seconds at a green light before proceeding through the intersection of 92nd Avenue and Southeast Flavel Street in Portland. Defendant then pulled over to the side of the road. The officer, who had not activated his patrol car's overhead lights or otherwise signaled for defendant to stop, pulled over and parked behind defendant. The officer approached defendant and asked if everything was okay. Defendant said that he had pulled over to look at his GPS. The officer did not notice any odor of alcohol, but

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

he did notice what he "believed was slurred speech[,] and [he] noticed that [defendant's] eyes were watery." The officer asked defendant if he had been drinking. Defendant said that he had one beer, and he offered to take field sobriety tests (FSTs).

The officer asked defendant for his identification, which defendant promptly provided. The officer then walked to his patrol car to conduct a records check. The records check revealed that defendant had a valid concealed handgun license. Based on that information, the officer walked back to defendant's truck and asked him if he had a firearm. Defendant answered that he did not, but he had a knife in his boot.

The officer asked defendant to step out of his truck; defendant did, and the officer removed two double-sided knives with 1.75-inch blades from defendant's boot. The officer proceeded with his DUII investigation and concluded that defendant was not under the influence of intoxicants. The officer cited defendant for carrying a concealed weapon and released him.

Defendant filed a motion to suppress the evidence derived from the officer's weapons inquiry, which, defendant argued, extended the DUII stop in violation of Article I, section 9. At the hearing on the motion, the officer testified that he ran a records check on defendant because he intended to conduct a DUII investigation and "[t]here is absolutely nothing safe about administering field sobriety tests on the side of the road at 12:30 in the morning, and before I do that, I'm going to need to know whether this person is wanted, and if so, what they're wanted for." The officer further testified that, after learning that defendant had a concealed handgun license, he asked defendant whether he had a firearm so that, if defendant did, he could remove it. The officer explained that he "would remove any edged article. I would remove a screwdriver from someone's pocket if I was going to be talking to them."

On cross-examination, the officer acknowledged that defendant had not engaged in any threatening conduct:

"Q   So he had done absolutely nothing to give you concern that he might attack you at this point, had he?

"A   No, sir.

"Q   In fact, he was being civil and cooperative with you, wasn't he?

"A   Yes, sir.

"Q   Not threatening or angry, combative in any way?

"A   That is correct."

The officer testified that defendant was "very" cooperative throughout the stop.

Defendant introduced a copy of the officer's video recording of the stop. When the recording begins, the officer is already at defendant's truck door and the officer and defendant have been speaking. The recording continues until the end of the stop and shows that, throughout the stop, defendant was responsive and deferential to the officer and that he did not engage in any hostile or furtive behaviors.

At the conclusion of the hearing, defense counsel argued that the officer had stopped defendant when he initiated the DUII investigation. He further argued that, under *Rogers/Kirkeby*, 347 Or 610, the officer could not ask questions about unrelated matters during the DUII stop, and that, under *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), the officer could not ask questions for officer safety reasons unless he had a reasonable suspicion, based upon specific and articulable facts, that defendant posed an immediate threat of serious physical injury.[2]

Defense counsel argued that the fact that defendant had a concealed handgun license did not justify the officer's weapons inquiry. Observing that "[i]ntuition and generalized fear do not give rise to a reasonable suspicion of an immediate threat to the safety of the officers or others present," defense counsel argued:

"[T]he [officer] here finds out my client is a concealed handgun permit holder. That might give me an intuition that his safety might be at issue, but my client—as [the officer]

_____

[2] Defense counsel argued that the officer lacked reasonable suspicion to initiate a DUII stop and lacked probable cause to conduct FSTs. The trial court rejected both of those arguments, and defendant has not renewed them on appeal.

testified, my client was being very cooperative and he was not acting aggressive or hostile or giving the Officer any reason to feel that my client was a threat to him.

"*****

"So I'm arguing * * * there was no indication that [defendant] posed any kind of threat to [the officer]."

In response, the state argued that the officer's weapons inquiry was justified by the officer's safety concerns. The prosecutor acknowledged that defendant had been "very agreeable" during the DUII stop and that the officer's inquiry could not be based on "a generalized sense of officer safety," or "a generalized suspicion that you might have a gun on you or you seem like a criminal or you are dressed like a criminal[,]" but the prosecutor argued that the officer "had particularized information based on running a search and seeing that [defendant] had a concealed handgun [license.]"

The trial court denied defendant's motion, concluding that, "based on the information that the Officer obtained on the records check about defendant having a permit to have a concealed handgun[,] *** his question to defendant from the standpoint of officer safety was a reasonable question about whether the defendant was possessing a handgun." Thereafter, defendant entered a conditional guilty plea to the single charged count, reserving his right to appeal the trial court's denial of his motion to suppress. *See* ORS 135.335(3) (providing that a defendant may enter a conditional guilty plea, reserving the right to appeal an adverse determination of a pretrial motion).

On appeal, defendant assigns error to the trial court's denial of his motion to suppress, renewing his argument that the officer's weapons inquiry unlawfully extended the DUII stop in violation of Article I, section 9, because it was not reasonably related to the stop. Specifically, he argues that the officer "detoured from the DUII investigation to question [him] about weapons." According to defendant, the fact that he had a concealed handgun license did not give rise to objectively reasonable suspicion that he posed a threat to the officer, "especially in light of the fact that [he] was cooperative, he made no furtive gestures, and

he did not have a criminal history—let alone a criminal history involving violence with police officers."

In response, the state argues that the officer's inquiry "was reasonably related to [the DUII] investigation and was intended to ensure [the officer's] safety while administering FSTs." Specifically, the state argues that, "[o]nce [the officer] was aware that defendant had a concealed firearms license, it was reasonable to inquire about weapons prior to conducting FSTs."[3] Therefore, the state concludes, the officer's weapons inquiry "was related to the ongoing DUII investigation and did not extend the scope of the stop or its duration in violation of Article I, section 9."

Article I, section 9, protects individuals against unreasonable searches and seizures. For the purposes of Article I, section 9, there are three categories of police-citizen encounters:

"(1) 'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9; (2) 'stops,' a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and (3) 'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime."

*State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010). To be reasonable, a stop for the purpose of conducting a criminal investigation must be based on reasonable suspicion that the person has committed, or is about to commit, a crime. *State v. Holdorf*, 355 Or 812, 823, 333 P3d 982 (2014).

---

[3] In its brief, the state argues that the officer's weapons inquiry was authorized by ORS 810.410(3)(d), which provides that a police officer conducting a stop for a traffic violation "[m]ay make an inquiry to ensure the safety of the officer, *** including an inquiry regarding the presence of weapons." The state's focus on the statute is misdirected because the issue in this case is not whether the officer's weapons inquiry was authorized by statute, but rather whether it violated the state constitution. As the Supreme Court explained in *State v. Amaya*, 336 Or 616, 625, 89 P3d 1163 (2004), "an officer's actions, even if authorized by ORS 810.410(3)(d), nevertheless must comply with Article I, section 9[.]"

An officer may not extend the duration of a stop by inquiring into unrelated matters, absent an independent justification for doing so. *Rodgers/Kirkeby*, 347 Or at 623-24; *State v. Kimmons*, 271 Or App 592, 601, 352 P3d 68 (2015); *State v. Hendon*, 222 Or App 97, 106, 194 P3d 149 (2008).

In *State v. Jimenez*, 357 Or 417, 353 P3d 1227 (2015), the Supreme Court addressed the issue of whether, in the course of a traffic stop, an officer may ask the stopped person whether the person is carrying any weapons. The court held that Article I, section 9, "does not permit a law enforcement officer to make such an inquiry as a matter of routine and in the absence of circumstances that indicate danger to the officer or members of the public[,]" but when the officer "has reasonable, circumstance-specific concerns for the officer's safety, the officer may inquire about the presence of weapons." *Id.* at 419.

In doing so, the court rejected the state's argument that an officer may always inquire about weapons during a traffic stop because "'[t]he inherent dangers to an officer in a traffic stop are undeniable.'" *Id.* at 422 (brackets in original). The court expressly declined to presume that a danger sufficient to justify a weapons inquiry exists in all stops. *Id.* at 426 ("When an officer does not reasonably suspect that the officer's safety or the safety of the public is threatened, safety concerns do not provide a connection between the officer's traffic and weapons investigations, and therefore, the two investigations are not reasonably related[.]"); *see id.* at 433 (Kistler, J., concurring) ("[T]o say, as the state does, that every stop poses a sufficient risk of injury to ask about weapons without regard to the circumstances is a proposition that is difficult to sustain.").

Instead, the court ruled that an officer conducting a traffic investigation may make a weapons inquiry when the inquiry is reasonably related to the investigation and reasonably necessary to effectuate it. *Id.* at 429. The court then explained:

"For a weapons inquiry conducted in the course of a traffic investigation to be reasonably related to that investigation and reasonably necessary to effectuate it, an officer must have reasonable, circumstance-specific concerns for the

> officer's safety or the safety of other persons who are present. * * * [I]f the officer does not have at least a circumstance-specific safety concern, then the officer's weapons inquiry has no logical relationship to the traffic investigation. And, if the officer's circumstance-specific safety concerns are not reasonable, then an officer who acts on those concerns violates Article I, section 9 [.]"

*Id.* Therefore, when a defendant moves to suppress evidence on the ground that it was obtained as a result of a weapons inquiry that unlawfully extended a stop, "the state must present evidence that (1) the officer perceived a circumstances-specific danger and decided that an inquiry about weapons was necessary to address that danger; and (2) the officer's perception and decision were objectively reasonable." *Id.* at 430.

Here, the state failed to carry its burden of establishing that the officer's weapons inquiry was reasonably related to the stop and reasonably necessary to effectuate it. The state's position was that the officer's inquiry was justified by the officer's concerns for his safety, but the state failed to prove that, given the totality of the circumstances, the officer had an objectively reasonable suspicion that defendant posed a threat to his safety sufficient to justify the inquiry. *See id.* at 426 (in order to justify an officer's weapons inquiry during a traffic stop, the state must establish that the officer reasonably suspected that "the officer's safety or the safety of the public [was] threatened"); *see also id.* at 434 (Kistler, J., concurring) (the state must prove that the circumstances of the particular stop "pose[d] a sufficient risk of harm to the officer or others present"); *State v. Steele*, 274 Or App 710, 711, 360 P3d 1287 (2015) (applying *Jimenez* in the context of a criminal stop).

First, and most importantly, nothing about defendant's conduct during the stop indicated that he posed a danger to the officer. The officer acknowledged that defendant "had done absolutely nothing" to cause the officer to believe that he was a threat. According to the officer, defendant was civil and cooperative. He answered the officer's questions, provided the officer with his identification, and volunteered to take FSTs. He was not angry, threatening, or combative in any way. And, there is no evidence that

he was aggressive, evasive, or even nervous. As the prosecutor stated, defendant was "very agreeable." *See State v. Steffens*, 250 Or App 742, 752-54, 282 P3d 888 (2012) (where the defendant was "relaxed, unconcerned, and cooperative" during the traffic stop, the defendant's recent arrest for possession of a concealed handgun did not support an inquiry into whether the defendant had weapons); *State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996) (where the defendant's demeanor throughout the traffic stop "was entirely cooperative, nonhostile, and nonthreatening," the defendant's furtive movements towards the floor board while in the car and the defendant's later presence outside the car did not support an inquiry into whether the defendant had weapons); *State v. Peterson*, 143 Or App 505, 510-11, 923 P2d 1340 (1996), *rev den*, 327 Or 521 (1998) (where "there was nothing in [the] defendant's behavior to suggest imminent aggressiveness or hostility toward [the officer,]" the defendant's nervousness and furtive movements toward the passenger seat area in his car during the traffic stop did not provide sufficient basis for an inquiry into whether the defendant had weapons).[4]

Second, nothing about defendant's past conduct indicated that he posed a danger to the officer. There is no evidence that defendant had any arrests, convictions, or warrants. All that the officer learned when he ran the records check was that defendant had a valid concealed handgun license. But that fact was not sufficient to give rise to an objectively reasonable suspicion that defendant was currently carrying a firearm, much less that he might use it against the officer. Having a concealed handgun license is not, in and of itself, an indication of dangerousness.

In fact, having a concealed handgun license indicates that a person does not have a history of engaging in dangerous or threatening behavior. A person who applies for a concealed handgun license must submit to a background check, and a person cannot receive a concealed handgun

---

[4] We recognize that these cases were decided before *Jimenez* and under the *Bates* standard. Nonetheless, they support the proposition that a defendant's cooperative conduct, in combination with other properly considered circumstances, militates against a reasonable perception of danger.

license if the person has any outstanding warrants, is on any form of pretrial release, has ever been convicted of a felony, or has been convicted of a misdemeanor within four years of the application. ORS 166.291(1)(d), (e), (g), (h), (3)(b). In addition, a person cannot receive a concealed handgun license if the person has been civilly committed, is subject to a restraining order or stalking protective order, has been dishonorably discharged from the military, is a registered sex offender in any state, or—subject to certain limited exceptions—has participated in a drug diversion program. ORS 166.291(1)(i), (L), (m), (n), (o). Thus, the fact that defendant had passed the background check to get a concealed handgun license indicates that he did not have a history of behavior that would suggest that he might pose a threat to the officer's safety.

And, third, nothing about the setting of the stop indicated that defendant posed a danger to the officer. The state did not present any evidence that the stop occurred in a high-crime area. Nor did it present any evidence that other potentially dangerous persons were present; defendant was alone in his truck. The stop occurred at night, but, as the officer testified, he could see well enough to observe defendant. The scene was illuminated by the officer's patrol car's headlights, as well as nearby street and building lights. The location of the stop was not remote; it was on a two-way city street, with a marked bike lane and an adjacent sidewalk. And, although it was late at night, there was consistent traffic on the street.

The state argues that the officer's weapons inquiry was authorized "because it was reasonably related to the ongoing DUII investigation and was intended to ensure his safety." In support of its argument, the state relies on the officer's testimony "that giving FSTs [is] inherently dangerous." The state's argument is similar to the one the state made in *Jimenez*. 357 Or at 422, 424-25. As discussed, in *Jimenez*, the state argued that officers may always inquire about weapons during traffic stops because "'[t]he inherent dangers to an officer in a traffic stop are undeniable.'" *Id.* at 422 (brackets in original). In the course of rejecting that argument, the Supreme Court noted that the state had not provided an evidentiary basis for the court to assess the

actual risks faced by officers conducting traffic stops. *Id.* at 425. The court observed that, although the state had cited United States Supreme Court decisions that, in turn, cited statistics regarding the incidence rates of officer shootings and assaults, the state had not asked the court to "take judicial notice of those statistics" or "suggest[ed] another basis on which [the court could] conclude that Portland police officers face equally dangerous risks when they patrol its streets." *Id.* The court further observed that the statistics did not "include the total number of stops that the officers conducted or the number of stops that the officers conducted without incident[,]" *id.* at 425-26, and quoted Justice Stevens' statement that "'the number of stops in which an officer is actually at risk is dwarfed by the far greater number of routine stops.'" *Id.* at 426 n 9 (quoting *Maryland v. Wilson*, 519 US 408, 418, 117 S Ct 882, 137 L Ed 2d 41 (1997) (Stevens, J., dissenting)).[5] In this case, as in *Jimenez*, the state has failed to present an evidentiary basis upon which we can conclude that the officer's weapons inquiry in this case was authorized on the ground that the administration of FSTs is "inherently dangerous."

The dissent contends that, as required by *Jimenez*, "the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger" and that the officer's "perception of danger and decision to ask about weapons were objectively reasonable." 277 Or App at 162-63 (Hadlock, J, dissenting)

---

[5] In *Jimenez*, the court also called attention to a study indicating that the incidence rate of violence toward officers in traffic stops may be lower than commonly perceived:

"In this case, *amici curiae* call our attention to a 2001 study analyzing the number of incidents of violence during traffic stops in relation to the millions of routine traffic stops that occur annually. According to the study, on average over a ten-year period, 'the risk of homicide to a police officer during a traffic encounter was one in 6.7 million' stops and 'the risk of assault to a police officer was one in 10,256 stops.' Illya D. Lichtenberg and Alisa Smith, *How Dangerous Are Routine Police-Citizen Traffic Stops? A Research Note*, 29 J Crim Just 419, 420 (2001). *Amici* caution against a *per se* expansion of police powers based on anecdotal evidence of dangers to police officers in the absence of scientific data supporting a need for wider police latitude."

357 Or at 426 n 9. The 10,256 number is based on a "low-end estimate" of the total number of stops. If a "mid-range estimate" is used, on average over a 10-year period, the risk of assault drops to one in 20,512 stops. Lichtenberg and Smith, 29 J Crim Just at 424.

(internal quotation marks and brackets omitted). Given the totality of the circumstances of the stop in this case, we disagree with the dissent's contention that the officer's perception of danger and decision to ask about weapons were objectively reasonable. As discussed above, 277 Or App at 154-57, the case-specific evidence does not give rise to a reasonable suspicion that defendant posed a threat to the officer. Although defendant had a concealed handgun license, nothing in his conduct during the stop or in his record indicated that he posed a danger to the officer. To the contrary, defendant's conduct and record indicated that he was not engaging in, and had not previously engaged in, dangerous, threatening, or even evasive behavior. Because the officer's inquiry constituted an unlawful extension of the DUII stop, evidence obtained as a result of the inquiry should have been suppressed, and the trial court erred in concluding otherwise. *See Jimenez*, 357 Or at 431; *Kimmons*, 271 Or App at 601.[6]

Reversed and remanded.

**HADLOCK, J.,** dissenting.

Deputy Sheriff Steinberg encountered defendant at about 12:30 in the morning, after he saw defendant stop his car by the side of a road. Based on his observations of defendant's driving, his slurred speech, and his watery eyes, Steinberg quickly determined that defendant probably had been driving under the influence of intoxicants. Steinberg also discovered, during a records check, that defendant was licensed to carry a concealed handgun. Before administering roadside field sobriety tests (FSTs)—a circumstance that Steinberg explained would put him "in a compromising situation" and involved "absolutely nothing safe"— Steinberg asked defendant whether he had a firearm. The majority holds that, by asking that question, Steinberg

---

[6] The state has not argued, either in the trial court or on appeal, that the challenged evidence was not the product of exploitation of the illegal extension of the stop. Consequently, the trial court erred in denying defendant's motion to suppress. *See Kimmons*, 271 Or App at 602 (trial court erred in denying defendant's motion to suppress where the state "offer[ed] no reasoned explanation" to support its assertion on appeal that the evidence was not the product of police exploitation of illegal conduct).

violated defendant's state constitutional right to freedom from unreasonable searches and seizures.[1] I disagree. In my view, Steinberg's question was an objectively reasonable means of addressing "circumstance-specific concerns for the officer's safety or the safety of other persons" that the officer reasonably perceived to exist. *State v. Jimenez*, 357 Or 417, 429, 353 P3d 1227 (2015) (explaining when a law enforcement officer may conduct "a weapons inquiry * * * in the course of a traffic investigation"). Accordingly, I conclude that Steinberg did not violate Article I, section 9, of the Oregon Constitution when he asked the question. I therefore respectfully dissent.

The Oregon Supreme Court's recent decision in *Jimenez* guides my analysis. In explaining what actions a law enforcement officer may take when he or she is concerned about safety risks that arise during a traffic investigation, the court distinguished between a *search* for weapons and an *inquiry* about weapons. It is settled law that an officer's warrantless search for weapons (including a patdown) is justified under Article I, section 9, only "when 'the officer develops a reasonable suspicion, based upon specific and articulable facts, that [an individual] might pose an immediate threat of serious physical injury to the officer or to others then present.'" *Jimenez*, 357 Or at 423 (quoting *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (brackets in *Jimenez*)). However, as the Supreme Court recently explained in *Jimenez*, a different, less-demanding test applies when an officer merely inquires about weapons during the course of a traffic investigation, without conducting a physical search. Thus, even when a search would not be justified, a weapons inquiry still will be permissible if it is "reasonably related to and reasonably necessary to effectuate [the officer's] traffic investigation." *Id.* at 428. More specifically, an officer's weapons inquiry does not violate Article I, section 9, so long as the inquiry is based on "reasonable, circumstance-specific concerns for the officer's safety or the safety of other persons who are present." *Id.*

---

[1] That right is guaranteed by Article I, section 9, of the Oregon Constitution, which provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

at 429. Importantly, the officer's safety concerns need not be particularly associated with the person whom the officer has detained; rather, "they can arise from the totality of the circumstances that the officer faces." *Id.*

In *Jimenez*, the court described a two-part test for courts to use in evaluating whether the state met its burden of establishing that an officer's safety concerns justified a weapons inquiry:

> "To demonstrate that an officer's weapons inquiry is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that (1) the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger; and (2) the officer's perception and decision were objectively reasonable."

*Id.* at 430. "To determine whether that standard is met, a court must consider not only the factual circumstances that existed when the officer acted, but also the officer's articulation of the danger that the officer perceived and the reason for the officer's inquiry." *Id.*

In applying that test to the facts in *Jimenez*, the court concluded that the state had not established that the police officer who stopped the defendant had reasonable, circumstance-specific safety concerns that would be addressed by a weapons inquiry. The officer stopped the defendant for jaywalking, and the officer inquired about weapons while he was investigating that violation. The defendant admitted that he had a gun, which the officer found, and he eventually was charged with unlawful possession of a firearm. The defendant filed a suppression motion and, at the hearing on the motion, the officer did not testify about any circumstance-specific reasons for having asked the defendant whether he was carrying weapons. Instead, he testified that he asks about weapons "with all contacts on the street with pedestrians, just for—obviously for officer safety reasons." *Id.* Perhaps because of that testimony, the state urged the Supreme Court to adopt "a blanket rule" under which police officers *always* could inquire about

weapons during the course of a traffic investigation. *Id.* at 422. The court rejected that invitation, holding instead that weapons inquiries are permissible only when an officer has "reasonable, circumstance-specific safety concerns" that such an inquiry would address. *Id.* at 431.

In applying the *Jimenez* holdings to this case, I find the following facts significant. At about 12:30 in the morning, Steinberg saw defendant driving a truck on a street in the Portland metropolitan area. At one point, defendant stopped for a red light, but did not immediately proceed through the intersection when the light turned green; rather, after a pause exceeding two seconds, defendant turned and then pulled over on the side of the road. Steinberg pulled in behind defendant's truck, walked to defendant's window, and asked him if everything was okay. When defendant responded that he had pulled over to look at his GPS, Steinberg noticed that defendant's speech was slurred and his eyes were watery. Steinberg asked defendant if he had been drinking, and defendant acknowledged that he had. Steinberg obtained defendant's identification and ran a records check, which revealed that defendant had a concealed handgun license. Steinberg walked back to defendant's truck and "asked him about having a firearm."[2] Defendant said that he did not have a handgun on him, but volunteered that he had a knife in his boot. Steinberg found two knives in defendant's boot, and he removed those knives before he administered a range of FSTs, which defendant passed. Defendant was civil and cooperative throughout the encounter. Steinberg did not arrest defendant for driving under the influence of intoxicants, but did cite him for carrying a concealed weapon.[3]

At the suppression hearing, Steinberg explained why he had asked for defendant's identification:

---

[2] Steinberg did not testify about the exact words he used in making the weapons inquiry. The statement quoted above is taken from Steinberg's testimony on direct examination. On cross-examination, Steinberg answered affirmatively when defense counsel asked if he had "decided for [his] own safety to ask [defendant] if he had a handgun on him."

[3] Steinberg explained during the suppression hearing that defendant's concealed handgun license did not permit him to carry concealed the type of double-bladed knives that he had in his boot.

"A   Well, in this circumstance, at that particular moment, I was investigating a criminal offense, and that was my purpose for obtaining the identification.

"I knew that I was going to conduct a criminal investigation, and before I'm going to conduct a criminal investigation out on the side of the road, I need to know who I'm dealing with.

"Q   Why is that important?

"A   Well, this is somebody that I'm going to be talking to face to face. *There is absolutely nothing safe about administering field sobriety tests on the side of the road at 12:30 in the morning*, and before I do that, I'm going to need to know whether this person is wanted, and if so, what they're wanted for.

"I just—just need to know those things before *I'm going to put myself in a compromising situation in which it's inevitable for field sobriety tests.*"

(Emphases added.)

Steinberg also explained why he asked defendant about having a firearm once he learned that defendant had a concealed handgun license:

"Q   [I]f you knew that [he had] this permit, why is it important to ask him [about having a firearm]?

"A   Well, * * * the only reason I can think that one would have a concealed handgun permit would be to have a concealed handgun, and so *if I'm going to conduct this investigation, I'm not going to allow him to have a handgun on his person.* I would have to remove that handgun from him before I'm going to continue with the investigation."

(Emphasis added.)

Steinberg characterized that procedure of removing weapons before administering FSTs to suspected intoxicated drivers as "police work 101." He opined that he would "be negligent" if he did not remove either a handgun or a knife from a person to whom he was about to administer FSTs.

In my view, the circumstances in this case satisfy the two-part test set out in *Jimenez*. First, the state presented

evidence that "the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger." *Jimenez*, 357 Or at 430. In explaining the risks he perceived during his encounter with defendant, Steinberg specifically mentioned that the stop occurred late at night; that he was going to be investigating a suspected DUII; that the investigation would entail administering FSTs at the side of the road, which Steinberg explained would put him "in a compromising situation"; that defendant had a concealed handgun license, which Steinberg inferred defendant had obtained so that he could lawfully carry a handgun; and that he believed he would "be negligent" if he did not remove a weapon from a person to whom he was about to administer FSTs. Steinberg's testimony on those points constitutes evidence of a specific set of circumstances that he perceived presented a danger. This is not a case like *Jimenez*, in which the officer testified that he always asks about weapons during encounters with pedestrians.

The state also presented evidence that Steinberg's "perception [of danger] and decision [to ask about weapons] were objectively reasonable." *Id.* Steinberg had probable cause to believe that defendant had driven while intoxicated. If that was true, it would mean that defendant was impaired and already had exhibited poor judgment by deciding to drive in an intoxicated state. Steinberg was about to administer FSTs to that possibly impaired, reckless person—a task that presumably would require Steinberg's focused attention, perhaps leaving him less able to watch what defendant was doing with his hands, and less likely to immediately notice if defendant were reaching for a weapon. Steinberg would be administering those tests late at night, alongside a roadway—a circumstance about which, he testified, "[t]here is absolutely nothing safe." And, finally, Steinberg knew that defendant had a concealed handgun license, leading Steinberg to believe that defendant might be carrying a handgun. In my view, it was objectively reasonable both for Steinberg to perceive danger in those specific circumstances, despite defendant's civil and cooperative demeanor, and to decide that a weapons inquiry would help alleviate that danger. Accordingly, I conclude that the trial

court ruled correctly when it denied defendant's motion to suppress evidence that Steinberg discovered as a result of the weapons inquiry.

In sum, I do not believe that the Oregon Constitution prohibits a law enforcement officer from taking the minimally intrusive precaution of inquiring about weapons before administering roadside FSTs, at night, to a suspected drunk driver who has a concealed handgun license, no matter how cooperative that driver may be. *Jimenez* does not hold otherwise. I respectfully dissent.