EGAN, C. J.
*1133 *279 Defendant, who was convicted after a stipulated facts trial of one count of possession of methamphetamine, ORS 475.894, appeals, assigning error to the denial of a motion to suppress evidence. As ultimately framed by the parties on appeal, the dispositive issue reduces to whether an officer's request for consent to frisk defendant for weapons during a criminal investigatory stop unlawfully extended that stop. We conclude that the officer's request was based on an objectively reasonable perception of "circumstance-specific concerns for [his] safety" and an objectively reasonable "deci[sion] that [that request] was necessary to address that danger." State v. Jimenez , 357 Or. 417, 429-30, 353 P.3d 1227 (2015) ; see also State v. Miller , 363 Or. 374, 381, 422 P.3d 240, adh'd to as modified on recons , 363 Or. 742, 428 P.3d 899 (2018). Accordingly, we affirm.
Whether an officer's actions effected an unlawful extension of a stop is a question of law, which we review for errors of law. State v. Rodgers/Kirkeby , 347 Or. 610, 625, 227 P.3d 695 (2010). The facts material to our review are undisputed.
In the early evening of April 1, 2014, Oregon State Police Sergeant Plummer was on patrol near Shaw, in Marion County. Plummer, a highly-experienced officer with nearly 25 years' service in the Patrol Services Division and who regularly patrolled in the Shaw area, noticed a pickup truck that he did not recognize pulled over to the side of a rural road. His attention heightened when, after he had passed the vehicle, the pickup "pulled a U-turn." Plummer followed and noticed, when the pickup stopped at an intersection and later slowed at a railroad crossing, that one of its brake lights was not working. Plummer stopped the pickup for that traffic violation.
Plummer then approached the pickup from the passenger side.[1] As he did so, it "was still light outside" and traffic was light. Defendant was the driver, and with him were two passengers, a man and a woman; the windows were rolled *280 down. Plummer explained why he had initiated the stop and asked for defendant's driver's license, registration, and proof of insurance-and, as he did so, Plummer smelled what he believed to be the odor of "unused" (as opposed to "burnt" or "smoked") methamphetamine "coming from inside the vehicle." The odor "wasn't overwhelming," but "it was enough to get [Plummer's] attention."[2] After Plummer obtained the documents from defendant, but before he returned to his patrol car to run a check on that information, another officer radioed to ask if Plummer "needed a cover unit." Plummer responded that he did.[3]
The ensuing records check disclosed no license suspensions, outstanding warrants, or such concerning information as assaultive conduct against police officers. But for the smell of methamphetamine, at that point Plummer would ordinarily have issued a warning about the equipment violation, and defendant would have been free to go. Instead, Plummer returned to the pickup and, because he believed he had reasonable suspicion of possession of methamphetamine (though he had no "indication of which of the three persons in the truck had the methamphetamine"), Plummer asked defendant to step out of the vehicle to talk with him.
Defendant, who had been fully "cooperative" during the encounter, complied. Plummer spoke with defendant at the rear of the pickup, to separate defendant from his passengers, and told defendant that he had smelled the odor of methamphetamine coming from inside the pickup and wanted to talk with defendant and his passengers about that odor. Although defendant responded that he *1134 "didn't have any problem with that," his demeanor changed once Plummer "brought up the methamphetamine." From that point in the encounter, defendant "stiffened," becoming "more nervous" and "more rigid," "nervously looking side to side and away," avoiding eye contact with Plummer and, instead, "look[ing] at his peer" in the cab of the pickup. *281 Defendant also assumed a different and "unusual" body posture, which Plummer described as someone "get[ting] in that fight or flight mode." To Plummer, defendant appeared to be "starting to calculate whether [he] should stay, whether [he] should run, whether [he] should fight[.]" For reasons amplified below, see 295 Or. App. at 289-90, 432 P.3d at 1139, that change in defendant's demeanor and posture-which deviated from the typical "reasonable arc of movement"[4] -made Plummer "nervous." Plummer "didn't want [defendant] reaching into his pants pockets."[5] Accordingly, Plummer asked defendant if he could frisk the area of his pants pockets "for my safety."[6] Defendant responded affirmatively.
Plummer then frisked defendant's pants pocket area and felt an object that was similar in shape and dimensions to either an inhaler or a drug pipe. When Plummer asked defendant what the object was, defendant replied that it was "something to hold keys with" and agreed to take the object out so Plummer could see it. As defendant started to pull the object (which was, in fact, a hollow key holder) from his pocket, its lid split, momentarily revealing what appeared to be the cap of a syringe, and Plummer smelled the odor of methamphetamine. When Plummer told defendant that he had smelled methamphetamine and, ultimately, that "he could open [the container] or [Plummer] could," defendant began to call out to the woman passenger in the pickup for his cell phone so he could call an attorney. Plummer, concerned that the encounter was "heightening," ordered defendant to place his hands on the hood of the patrol car. Plummer then removed the container from defendant's pocket and opened it; inside was a used syringe and what proved to be crystal methamphetamine.
*282 Defendant was charged with one count of possession of methamphetamine. He moved to suppress the evidence discovered as a result of the frisk. In so moving, defendant asserted, inter alia , both that (1) Plummer lacked reasonable suspicion of drug-related crimes and, thus, could not extend and expand the predicate traffic stop on that basis; and (2) the request for consent to a frisk was not justified by sufficient officer safety concerns.
The state remonstrated that (1) given the ambient odor of methamphetamine in the pickup, the stop was lawfully extended to investigate drug-related crimes; and (2) the request for consent to an officer safety related frisk was lawful under the construct adopted in State v. Bates , 304 Or. 519, 524, 747 P.2d 991 (1987).[7] At no time before the trial court did the state contend that Plummer's request for consent to frisk was based on a belief that the frisk could yield evidence of drug-related crimes; rather-perhaps because Plummer had explicitly phrased, and framed, his request for consent to frisk by reference to "my safety"-the state relied *1135 solely on an officer safety justification for that request.
At the suppression hearing, Plummer was the sole witness. In addition to recounting the circumstances recounted above, he also, as set out below, 295 Or. App. at 289-90, 432 P.3d at 1138-39, testified regarding the dangers of traffic stops generally as well as his perception and assessment of those risks attending his encounter with defendant specifically.
The trial court denied the motion to suppress, concluding in part that the request for consent to "pat [defendant] down for officer safety" was lawful because Plummer had "developed a reasonable suspicion that Defendant may be in possession of a weapon or some other instrument capable of causing physical injury." As noted, defendant was subsequently convicted, following a stipulated facts trial, of possession of methamphetamine, and this appeal ensued.
*283 On appeal, and in the light of the Supreme Court's intervening issuance of Jimenez and Miller , the parties have refined their positions.[8] Defendant no longer disputes that, given the odor of methamphetamine in the pickup, Plummer had reasonable suspicion that "the [pickup] contained-or that one of its occupants possessed-methamphetamine." Rather, defendant's sole, ultimate contention is that Plummer's request for consent to frisk did not comport with the standards established in Jimenez and reiterated in Miller and, thus, unlawfully extended that stop, even if that stop had morphed into a criminal investigatory stop.[9]
The state initially countered with two principal responses. First, the state asserted that the Jimenez construct, which was announced in the context of a traffic stop, should not be extended to criminal-investigatory stops. That contention has now been foreclosed by Miller , in which the Supreme Court, without qualification, applied Jimenez to circumstances in which, "[b]ased on his initial encounter with defendant, the officer developed reasonable suspicion that defendant had committed the crime" of driving under the influence of intoxicants" (DUII). 363 Or. at 377, 422 P.3d 240.[10]
Second, the state asserted, and continues to assert, that, in the totality of the circumstances, Plummer's request satisfied Jimenez 's requisites.[11] In that regard, we do not understand the state to contend on appeal-as it did not do *284 before the trial court, see 295 Or. App. at 282, 432 P.3d at 1134-35that Plummer's request could be alternatively justified as based on a reasonable suspicion that a frisk would reveal evidence of drug possession.[12] Accord *1136 Jimenez , 357 Or. at 423-24, 353 P.3d 1227 (noting that the state there did not argue that "the trooper's inquiry was independently justified by reasonable suspicion that defendant was in violation of criminal laws pertaining to the possession of weapons"). Nor does the state dispute that, if the request for consent to frisk did not meet Jimenez 's dictates, that request concomitantly effected an unlawful extension of the stop, requiring suppression.[13]
We turn first to Jimenez. There, an officer stopped the defendant, who was dressed in clothing that the officer thought might indicate gang affiliation and could conceal the presence of weapons, for a jaywalking violation at an intersection in a high-crime area with "a lot of recent gang activity." 357 Or. at 419-20, 430, 353 P.3d 1227. After some brief conversation, the officer asked the defendant whether he "ha[d] any weapons on [him]" and defendant responded that he had a gun. Id. at 420, 353 P.3d 1227. The officer proceeded to frisk the defendant and seized the weapon. Id.
The defendant, who was charged with unlawful possession of a weapon, ORS 166.250(1)(a), moved to suppress, contending, inter alia , that the officer's question *285 about weapons effected an "unjustified extension of the traffic stop." Id. at 421, 353 P.3d 1227. The state countered that the officer's inquiry was a permissible officer safety measure under the test announced in Bates , 304 Or. at 524, 747 P.2d 991.[14] Jimenez , 357 Or. at 421, 353 P.3d 1227. At the hearing on the motion to suppress, the officer testified that he had asked the defendant about weapons because that is what he did for "all contacts on the street with pedestrians, just for-obviously for officer safety reasons." Id. Thus, the officer testified that he invariably asked the same question in every pedestrian stop, and he offered no circumstance-specific explanation as to why he believed such an inquiry was warranted to address officer safety concerns in the context of the particular encounter. The trial court denied the suppression motion, id. , and, ultimately, the Supreme Court reversed and remanded. Id. at 431, 353 P.3d 1227.
Two aspects of Jimenez are most germane to our present consideration. First , the Supreme Court held that the strictures of the Bates test apply only to unilateral police conduct (e.g. , conducting an unconsented frisk) in response to perceived officer safety concerns, and not to inquiries in response to such concerns. As the court explained:
"Although the particularity requirements of Bates * * * must be met before an officer may conduct a search or a patdown search for weapons, those requirements do not apply when an officer has seized an individual and has a constitutional basis to continue to temporarily detain and question him or her. In that circumstance, if the officer's weapons inquiry is reasonably related to and reasonably necessary to effectuate the officer's traffic investigation, then * * * it is lawful."
357 Or. at 428-29, 353 P.3d 1227 ; see also Miller , 363 Or. at 388, 422 P.3d 240 (emphasizing constitutional distinction between "conducting a search for weapons during a lawful stop" and "asking a question that is reasonably related to and reasonably necessary to effectuate a lawful investigative stop" (emphases in original) );
*286 Jimenez , 357 Or. at 434, 353 P.3d 1227 (Kistler, J., concurring) ("A question is not a search. To require the same justification for both * * * fails to recognize the difference."). Here, defendant consented to the search request, so the only *1137 issue is whether the officer's question unlawfully extended the stop.
Second , the court defined the contours and content of the " 'reasonably related' " test in the context of officer safety related inquiries:
"For a weapons inquiry conducted in the course of a traffic investigation to be reasonably related to that investigation and reasonably necessary to effectuate it, an officer must have reasonable, circumstance-specific concerns for the officer's safety or the safety of other persons who are present. To justify an officer's weapons inquiry, the officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces. However, if the officer does not have at least a circumstance-specific safety concern, then the officer's weapons inquiry has no logical relationship to the traffic investigation. * * *
" * * * To demonstrate that an officer's weapons inquiry is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that (1) the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger; and (2) the officer's perception and decision were objectively reasonable. To determine whether that standard is met, a court must consider not only the factual circumstances that existed when the officer acted, but also the officer's articulation of the danger that the officer perceived and the reason for the officer's inquiry."
Id. at 429-30, 353 P.3d 1227 ; see also State v. Pichardo , 360 Or. 754, 762, 388 P.3d 320 (2017) (noting that "[t]he reasonable relationship test that the court articulated in [inter alia ] Jimenez is not a demanding one").
Applying that standard, the Supreme Court concluded that, because the officer had not testified that his inquiry about weapons was based on a perception of danger arising from circumstances specific to the encounter, but had, instead, merely adhered to a generic, invariable practice, the state had failed to meet its burden of establishing *287 that the officer's inquiry was "reasonably related" to the predicate investigation and "reasonably necessary to effectuate it." Jimenez , 357 Or. at 430, 353 P.3d 1227 ; see also id. at 435, 353 P.3d 1227 (Kistler, J., concurring) (" 'Officer safety' explains the nature of the officer's concern. It does not identify the facts that, in his mind, gave rise to that concern."). In so holding, the court observed that, "[a]lthough the facts known to the trooper at the time that he inquired about weapons might have given rise to reasonable, circumstance-specific safety concerns, the trooper did not so testify." Id. at 430-31, 353 P.3d 1227. In a concurring opinion, three members of the court expressed the view that, if the officer had so testified, the totality of the circumstances of the encounter "were sufficient to warrant asking defendant if he had a weapon." Id. at 435, 353 P.3d 1227 (Kistler, J., concurring).
In Miller , the Supreme Court elaborated on Jimenez 's application in circumstances in which an officer did proffer a more particularized, circumstantially-related justification for his weapons inquiry. There, the officer approached the defendant's car, which was pulled off to the side of the road late at night, to offer assistance. During the course of the ensuing encounter, the officer developed reasonable suspicion that the defendant had committed DUII. Miller , 363 Or. at 377, 422 P.3d 240. After obtaining the defendant's identification and running a records check,[15] but before administering field sobriety tests, the officer asked the defendant if he had a firearm with him. Id. The defendant responded that he "had a knife on his boot, or leg," and the officer removed two knives from the defendant's boot and, ultimately, cited the defendant for unlawfully carrying a concealed weapon. Id.
The defendant moved to suppress both his admissions and the knives, contending that the officer's weapons inquiry unlawfully extended *1138 the lawful DUII stop because that inquiry was not independently justified under the Bates standard.[16] Id. at 378, 422 P.3d 240. As support for that contention, the *288 defendant invoked the officer's acknowledgment that the defendant had been "civil and cooperative" throughout the encounter and "had done absolutely nothing to give [the officer] concern" that the defendant presented a threat. Id. at 382, 422 P.3d 240. Conversely, the state elicited testimony from the officer in which he explained that "there is absolutely nothing safe about administering field sobriety tests on the side of the road at 12:30 in the morning," and, because, in administering such tests to intoxicated or apparently intoxicated suspects, an officer is put "in a compromising situation," officer safety concerns about possible weapons are acute. Id. at 381-82, 422 P.3d 240.
The trial court denied suppression, and the defendant entered a conditional guilty plea. Id. at 378, 422 P.3d 240. On appeal, we reversed and remanded, concluding that, although the officer did offer a circumstance-specific rationale for his weapons inquiry, the totality of the circumstances was insufficient to support "an objectively reasonable suspicion that defendant posed a threat to [the officer's] safety sufficient to justify the inquiry." State v. Miller , 277 Or. App. 147, 154, 370 P.3d 882 (2016) ; but see id. at 158, 370 P.3d 882 (Hadlock, C. J., dissenting).
On review, the Supreme Court reversed our decision and affirmed the trial court. In so holding, the court began by distinguishing Jimenez , where the officer acknowledged that he invariably asked about weapons regardless of the circumstances of a stop and offered only a generic, not circumstance-specific, justification. In contrast, in Miller , the officer explained precisely why, given the circumstances of a DUII roadside investigative stop, he "perceived a danger * * * and perceived it was necessary to ask about weapons to address that danger." 363 Or. at 385, 422 P.3d 240.
The Supreme Court further concluded that, in the totality of the circumstances, "those perceptions were objectively reasonable." Id. at 386, 422 P.3d 240. Specifically, the court first pointed to the nature of the stop-a DUII investigation on the side of the road at 12:30 in the morning-as being "particularly significant," given "the risk of danger that might be presented if an intoxicated suspect were to have a firearm on his person when an officer conducted field sobriety tests."
*289 Id. at 387, 422 P.3d 240. The court also noted that "an officer's training and experience can be a significant consideration." Id. (emphasis added). As the officer in Miller had "significant training in the investigation of suspected DUII offenses, including training to become certified to instruct law enforcement officers throughout the state on field sobriety testing," the court determined it was "appropriate" to consider the officer's assessment of the circumstances. Id. at 387-88, 422 P.3d 240. Conversely, the court noted, there was "no evidence in the record [that] calls into question the officer's description of the risk." Id. at 388, 422 P.3d 240.
The Supreme Court in Miller closed by reiterating, as it had previously "emphasized," that "the 'reasonable relationship' test of Jimenez is 'not a demanding one.' " Id. (quoting Pichardo , 360 Or. at 762, 388 P.3d 320 ). The court concluded that, given the considerations it had highlighted, the officer's inquiry satisfied that test. Id. at 388-89, 422 P.3d 240.[17]
Thus oriented, our application of Jimenez and Miller here focuses, necessarily, on Plummer's testimony. We do not understand defendant to contest that Plummer subjectively perceived a risk to his safety and subjectively decided that a request for consent to frisk was necessary to address that perceived *1139 risk.[18] Thus, the question reduces to whether Plummer's uncontroverted testimony substantiated an objectively reasonable perception of danger and consequent justification for the request for consent to frisk.
Before relating the specific circumstances of the encounter, Plummer testified, generally, that needles used to inject methamphetamine can be used as weapons-indeed, he had personally witnessed at least one incident in which a person had been injured by the use of such a needle as *290 a weapon. Plummer also testified that methamphetamine users are potentially dangerous, explaining that users who are in a state of "excited delirium" (which he clarified is what "once [had been] known as tweaking"), are "unpredictable" and "cyclic in their behavior": "They can go from a state of relative calm to a state of highly excitable, volatile and dangerous." As a further prelude, Plummer, who had been involved in "traffic stops gone bad," also generally described the potential dangers of traffic stops, emphasizing that "the dangerous thing * * * is that I don't know the person in the car. * * * I don't know what's in their mind." Consequently, Plummer explained, officers are trained "to be very vigilant on their approach to vehicles, to constantly be looking for hands, for movement, for unusual movement * * * because the unknown will present itself sooner or later."
After Plummer described the circumstances of this encounter, including his request for consent to frisk, see 295 Or. App. at 281, 432 P.3d at 1134-35, he elaborated on his reasons, based on those circumstances, for seeking that consent. Plummer identified a variety of matters which, in combination, "just continued to ratchet up my concern for my safety," including: (1) the dramatic, immediate change in defendant's demeanor-deviating from the "reasonable arc of movement"-when Plummer mentioned methamphetamine; and (2) the particular character of the change in defendant's posture, which to Plummer indicated that "somebody is starting to calculate whether they should stay, whether they should run, whether they should fight" (which Plummer described as "get[ting] in that fight or flight mode").
Thus, Plummer's explanation, although offered months before Jimenez , while generalized in some respects, was also in part circumstance-specific-perhaps even more so than in Miller -in diametric contrast to the generic justification given by the officer in Jimenez .
In assessing the sufficiency under Jimenez and Miller of Plummer's explanation, we note, at the outset, that several matters and circumstances to which Plummer referred are either inapposite, or only marginally material, to the inquiry. For example, although Plummer described the potential dangers of engaging with methamphetamine *291 users who are in a state of "excited delirium," 295 Or. App. at 290, 432 P.3d at 1139-40, he also acknowledged on cross-examination that defendant was not in such a state.[19] Similarly, although Plummer described the significance of suspects' "unusual" hand movements as an officer approaches a stopped vehicle and testified that he "didn't want [defendant] reaching into his pants pockets," he did not testify that he observed defendant or either of his passengers making furtive movements as he approached the pickup or that defendant ever reached for his pockets as he and Plummer talked outside the pickup. See 295 Or. App. at 281 n. 5, 432 P.3d at 1134-25 n. 5.
Nevertheless, what remains was sufficient in its totality to satisfy Jimenez and Miller . Plummer was alone on a rural road with defendant and two other potential suspects. He reasonably suspected that defendant and/or his passengers possessed methamphetamine-and he knew, from personal experience, that needles used to inject methamphetamine could be used as a weapon. Once Plummer mentioned methamphetamine, defendant immediately became more nervous, *1140 "stiffen[ing]," avoiding eye contact with Plummer and, instead, looking towards "his peer" in the pickup. 295 Or. App. at 280, 432 P.3d at 1133-34. To be sure, such a sudden and dramatic change in demeanor-that stark deviation from the so-called "reasonable arc of movement"-could be indicative merely of potential culpability, and not of potential dangerousness. But that change in demeanor was coupled with an "unusual" change of posture, which Plummer described in detail and highlighted as being of particular "fight or flight" officer safety concern. We further observe, and emphasize that here, as in Miller , 363 Or. at 388, 422 P.3d 240, defendant did not "call into question"-by evidence or cross-examination, or even argument, at the suppression hearing-Plummer's extensive experience-based assessment of those circumstances.
The significance of "training and experience" averments or testimony in any "objective" legal construct varies according to the quality of that experience and its particular *292 relationship to the matter at issue. See, e.g. , State v. Holdorf , 355 Or. 812, 829, 333 P.3d 982 (2014) (emphasizing in context of assessing reasonable suspicion that "an officer's training and experience, as relevant to proving particular circumstances, is not presumed based solely on a police officer's employment status"); State v. Friddle , 281 Or. App. 130, 140-41, 381 P.3d 979 (2016) (concluding that such averments in application for search warrant did not substantiate probable cause).[20] Here, as in Miller , it is appropriate for us to consider Plummer's extensive experience as a traffic patrol officer, including with "traffic stops that have gone bad[.]" See Miller , 363 Or. at 387, 422 P.3d 240. "[P]roper regard" for that experience in the totality of these circumstances, Holdorf , 355 Or. at 827, 333 P.3d 982, leads us to conclude that Plummer's perception of danger was objectively reasonable.
In so concluding, we reject defendant's assertion that Plummer's perception cannot be deemed objectively reasonable, because he "did not identify a specific basis to believe that defendant possessed a weapon or explain why a weapon might be in defendant's pants pockets." As the Supreme Court instructed in Jimenez , 357 Or. at 429, 353 P.3d 1227, and reiterated in Miller , 363 Or. at 383-84, 422 P.3d 240, "the officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances the officer faces." Indeed, in Miller , the court determined that the officer's knowledge that the defendant was licensed to carry a concealed handgun "[did] not matter" in its ultimate assessment of the objective reasonableness of the officer's perception of danger that precipitated the weapons inquiry. 363 Or. at 377 n. 2, 422 P.3d 240, adh'd to as modified on recons. , 363 Or. 742, 428 P.3d 899. Further, Plummer did testify regarding the risk of the use of needles as weapons by methamphetamine users generally. We do not suggest that such testimony without more would be sufficient to justify a weapons inquiry, because here Plummer also testified regarding the abrupt change in defendant's demeanor and posture.
*293 We proceed, finally, to whether the request for consent to frisk was an objectively reasonable response to address Plummer's objectively reasonable perceived danger. We understand defendant to offer two principal responses. First, defendant contends that it was impermissibly unreasonable for Plummer to seek consent without first asking defendant if he possessed any weapons or, alternatively, asking defendant to keep his hands away from his pockets. Second, defendant asserts that, in all events, the request for consent was not reasonably" related to the potentially dangerous circumstances and behaviors that Plummer identified.
Those challenges are unavailing. Defendant's first contention partakes of an implicit premise that an officer's inquiry is objectively reasonable for purposes of Jimenez and Miller only if it is, at least initially, the "least restrictive" response to the perceived *1141 danger. That premise cannot be rationally, globally reconciled with Bates 's dictum that, even in assessing and reviewing unilateral "officer safety"-related conduct, the police "must be allowed considerable latitude to take safety precautions in such situations." Bates , 304 Or. at 524, 747 P.2d 991. If "considerable latitude" is to be accorded in the choice of appropriate means in that far more potentially invasive context, the same must be true of unadorned weapons inquiries. "Objectively reasonable" does not mean "least restrictive."[21]
Nor was the request for consent unreasonably related to the perceived danger. In that regard, defendant emphasizes that Plummer referred to the potential of persons in "fight-or-flight mode" "running out into traffic." To be sure, that was one potential risk that Plummer described, but it was not the only danger implicated by his testimony, including the potential of "fight," rather than "flight," with *294 the risk of defendant's use of a needle or other weapon in a struggle in either event.
We thus conclude, applying Jimenez and Miller , that the officer's question was reasonably related to a lawful criminal investigation and, therefore, did not unlawfully extend the stop. In so holding, we are especially mindful, as was the Supreme Court in Miller , that the "reasonable relationship" test " 'is not a demanding one.' " Miller , 363 Or. at 388, 422 P.3d 240 (quoting Pichardo , 360 Or. at 762, 388 P.3d 320 ). Jimenez is not Bates.
Affirmed.

Plummer explained that he did so because there was "very little shoulder" on the road.

Plummer was certified as both a drug recognition evaluator (DRE) and a DRE instructor.

There is no indication in the record that the "cover" officers had arrived by the time Plummer requested defendant's consent to frisk or when such back-up might reasonably have been expected.

Plummer explained that term as "mean[ing] generally when you're having conversation with people, you tell them why you stopped them. There is some anxiety to start with. But then it starts to abate itself. It seemed that [defendant] was doing just the opposite."

There is no indication in the record that defendant had been reaching towards or into his pants pockets or had engaged in any similar sort of furtive gesture before Plummer requested consent to frisk defendant.

Thus, as we discuss below, see 295 Or. App. at 283-84, 284 n. 12, 432 P.3d at 1135 n. 12, Plummer's request for consent was expressly based on, and delimited by, officer safety concerns and did not refer to evidence of drug possession.

The suppression proceedings before the trial court occurred in the summer and fall of 2014, nearly a year before the Supreme Court issued Jimenez in July 2015, holding that the Bates standard, which is set out below, 295 Or. App. at 287 n. 16, 432 P.3d at 1138 n. 16, does not apply to inquiries related to officer safety concerns. See Jimenez , 357 Or. at 428-29, 353 P.3d 1227 ; see also Miller , 363 Or. at 383-84, 422 P.3d 240.

After the Supreme Court granted review in Miller , we held this appeal in abeyance. Upon the Supreme Court's issuance of Miller , the parties, at our request, submitted supplemental briefing addressing that decision.

Defendant does not contend that, if the stop was not unlawfully extended by the request for consent, his consent was nevertheless involuntary.
Further, while defendant does contend that Plummer's request for consent was unjustified without first asking defendant whether he possessed any weapons, defendant does not contend that questions about weapon possession and requests for consent to search/frisk for weapons are constitutionally, qualitatively different-that is, that the former are tested against the Jimenez construct, but the latter should be subject to a different, more exacting standard.

Indeed, given the contextual differences, the permissible scope of inquiry during a criminal investigatory stop may well "entail a broader range of questions" than during a traffic stop. State v. Pichardo , 360 Or. 754, 760, 388 P.3d 320 (2017).

The state also raises a nonpreservation argument, which we reject without discussion.

During oral argument, we explored with counsel the possibility of sustaining the lawfulness of Plummer's request-and, thus, affirming the denial of suppression-on that alternative basis. Defense counsel responded that, if the state had raised that contention in the trial court, the record might well have developed very differently, given that Plummer's request was phrased explicitly in terms of officer safety concerns. Specifically, defense counsel emphasized both that (1) the express terms of Plummer's request informed and circumscribed the scope of defendant's consent and that nothing in the record addresses whether defendant would have consented to a more generally phrased request for consent or one that referred specifically to evidence of drug possession; and (2) the record was, at best, incompletely developed as to whether Plummer had reasonable suspicion that a frisk of defendant's pockets would yield evidence of drug possession. Given the prudential constraints on consideration of potential alternative bases for affirmance, see Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001), we agree that those circumstances are preclusive.

For example, the state does not posit that Plummer's request for consent occurred during an "unavoidable lull" in the predicate stop. Accord Jimenez , 357 Or. at 424 n. 7, 353 P.3d 1227 (noting that "the state did not argue in the trial court or the Court of Appeals that the trooper's inquiry occurred during an 'unavoidable lull' in the traffic investigation").

Under the Bates standard, an officer is permitted to take
"reasonable steps to protect [the officer] or others if, during the course of a lawful encounter with [an individual], the officer develops a reasonable suspicion, based upon specific and articulable facts, that [an individual] might pose an immediate threat of serious physical injury to the officer or to others then present."
304 Or. at 524, 747 P.2d 991.

That check disclosed that the defendant was licensed to carry a concealed handgun. However, "for purposes of [the court's] legal analysis * * * it [did] not matter why the officer perceived a risk that defendant might be carrying a gun[.]" Miller , 363 Or. at 377 n. 2, 422 P.3d 240, adh'd to as modified on recons. , 363 Or. 742, 428 P.3d 899 (2018).

In Miller , as in this case, 295 Or. App. at 282 n. 7, 432 P.3d at 1134-35 n. 7 the motion to suppress and its disposition antedated Jimenez.

The Supreme Court concurrently concluded that (although the trial court in Miller did not have the benefit of Jimenez ), given the trial court's disposition of the suppression motion, it had necessarily made an "implicit finding" that the officer there had, in fact, subjectively perceived a circumstance-specific danger and decided that his inquiry about weapons was necessary to address that danger, thus satisfying Jimenez 's subjective requisites.

Indeed, such a challenge would be unavailing, because here, as in Miller , 363 Or. at 388-89, 422 P.3d 240, the trial court, in denying the motion to suppress after a suppression hearing in which Plummer was the only witness, rendered an "implicit finding" crediting his account.

Significantly, however, Plummer did not qualify or limit his description of the risks of methamphetamine users use of needles as weapons to those who are in a state of "excited delirium."

See also State v. Daniels , 234 Or. App. 533, 541, 228 P.3d 695, rev. den. , 349 Or. 171, 243 P.3d 70 (2010) ("The phrase 'training and experience' *** is not a magical incantation with the power to imbue speculation, stereotype, or pseudo-science with an impenetrable armor of veracity.").

For a paradigmatic application of Bates 's dictum, see State v. Rickard , 150 Or. App. 517, 947 P.2d 215, rev. den. , 326 Or. 234, 952 P.2d 61 (1997) (in "high risk" stop, based on bystanders' statements that one of the occupants of a vehicle had a firearm, where all occupants of the vehicle had been handcuffed and were surrounded by officers with drawn weapons, police could reasonably under Bates reach into the occupants' pockets and pull out all of the contents rather than first engaging in an investigatory pat down for weapons); but see id. at 527, 947 P.2d 215 (Haselton, J., dissenting).